[No. H023393. Sixth Dist. July 22, 2003.]

THE PEOPLE, Plaintiff and Respondent, v.
ANDREW DOUGLAS BURNETT, Defendant and Appellant.

## COUNSEL

Arthur Dudley, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Bruce Ortega and David M. Baskind, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**PREMO, J.**—Incensed that the driver behind him tapped his car with her bumper, defendant Andrew Douglas Burnett, snatched her little white dog Leo out of her car and threw him onto a crowded roadway, where he was run over by a minivan and killed. Defendant was convicted of animal cruelty and received three years in state prison. On appeal, he challenges the sufficiency of the evidence, the instructions, and the competence of counsel.

FACTS

Shortly before 8:00 p.m. on February 11, 2000, Sara McBurnett was driving her 1997 Subaru Legacy northbound on Airport Boulevard to the San Jose Airport. Her 19-pound Bichon Frise Leo was asleep on the front seat. It was raining heavily and traffic was congested. Near the intersection with Airport Parkway, defendant, driving his black SUV with Virginia license plates, passed McBurnett very rapidly on the right shoulder, cut in front of her and into the lane to her left in front of another car. McBurnett needed to

move over herself to avoid having to make a right turn, and when the driver behind defendant left room for her, she changed lanes behind defendant. The back end of McBurnett's car was still in the lane she was leaving, so she "inched forward to get as close [as possible] to the car in front of me, which was the black SUV with Virginia plates .... And I'm afraid I made a judgment of depth error and the bumper tapped very lightly."

The driver's side door of the SUV swung open, and she saw a man get out of the car and walk in a very aggressive manner back to her while yelling something. He was White, about "20 something" years old, with a goatee and a baseball cap turned around backwards. He was "[s]ort of stomping forward and shouting at the same time." McBurnett could not hear him, so she rolled down the window. Defendant was shouting, "What the hell do you think you're doing?" McBurnett was "bewildered and perplexed" and answered, "What are you talking about?"

By then, Leo, who had been McBurnett's "constant companion" for 10 years, woke up and got into her lap. McBurnett explained, "[w]henever the window opens, he comes over to see if it's, for instance, the bank teller with a biscuit or something of that sort." Defendant reached into the car, grabbed Leo with both hands, pulled him out, turned his back to McBurnett, took one step away from her car making her think he was "going to dog nap" Leo, and threw Leo "pretty hard" into the oncoming lanes of traffic.

McBurnett got out of her car to run after Leo, but she had not put the car in "park" and it rolled and tapped defendant's bumper again. McBurnett got back into the car, placed it in "park," and then ran after Leo, dodging traffic. Leo was "terrified," and "he was crouching with his tail tucked under" as McBurnett had seen dogs do when they are terrified or injured. Witness John Mora saw Leo almost get hit three or four times, and McBurnett almost get hit twice. Then a white minivan came through the intersection and hit Leo. McBurnett picked up Leo, who she later realized bit her thumb severely, put him on the passenger seat of her car and put a jacket over him. She stated, "at that point [defendant] made a high speed, illegal right turn on a red light and fled." McBurnett heard the squeal of tires. She drove to the terminal where she was picking up her husband, a pilot, whose flight had been diverted to the San Jose Airport. Then they started to an emergency veterinarian, but Leo died about halfway there.

McBurnett had dialed 911 while she was still stopped on the roadway and when she and her husband got to the vet's office, someone called the police. McBurnett was told that it would take two hours to get an officer to the vet's office. They suggested that she go home and file a report at her local police department, which would send a courtesy report down to San Jose. The next day McBurnett filed a report with the Ross Police Department.

McBurnett denied that Leo snapped at defendant when he reached into the car, and denied that defendant reached into the car with one hand to point her in a direction to pull off the road. She denied that Leo had ever snapped or bitten anybody until he bit her when he was in pain after being hit.

Meanwhile, defendant went to the airport and picked up his cousin Stephanie Temple. She testified he did not say anything about the earlier incident although defendant's and her cell phone records showed four calls to him from her phone between 8:16 and 8:27 and one call from him to her at 8:33 p.m.

About two weeks after the incident, McBurnett told her story to the San Jose Mercury News. In the next two or three months, she appeared on Oprah, the Today show, Good Morning America, Inside Edition and a local radio talk show on KGO with Ronn Owens. Owens and KGO collected $120,000 in reward money to catch the person responsible for the crime. Later, a Web site was created about Leo and this incident.

The publicity and the existence of the reward caused residents of the area to keep their eyes open for a black SUV with Virginia plates. Two citizens testified at defendant's trial that they spotted defendant's black SUV. One, a private detective, followed it in mid-March 2000 from San Jose to Merced where the driver left it parked in the condominium complex where defendant's mother lived and later drove back to defendant's address in San Jose in a white Ford truck. The white pickup was in San Jose and the black SUV in Merced for at least two weeks. Another citizen noticed the SUV with Virginia plates and saw that the driver had a goatee. She followed defendant for a short distance on Winchester. She thought he realized he was being followed because he went faster and faster and then suddenly made a U-turn in the middle of the road and sped off in the opposite direction. Defendant was contacted by the police but not arrested for the crime against Leo until he was in custody on another charge.

The manager of defendant's apartment complex testified that defendant's black SUV matched the description of the vehicle involved in the incident with Leo. She became aware of the incident at the time it happened in February 2000, and afterward she noticed that defendant parked away from his assigned parking space, and frequently parked the SUV with the back end into the bushes to hide the license plate. She also noticed that defendant's appearance changed. "[H]e looked different every time I seemed to see him, … [¶] … [¶] Once in awhile [sic] when he would come in and pay rent, he would have a baseball cap on and glasses and facial hair, a beard. And another time, no hat, no glasses, maybe a moustache. He would just change his facial appearance. [¶] … [¶] [His hair] would be clean-shaven, or it would get long, or he would wear a hat."

Defendant was charged with a felony violation of Penal Code[1] section 597, subdivision (b).[2] That section punishes "every person who … cruelly kills any animal, or causes or procures any animal to be so … cruelly killed …." The jury found defendant guilty as charged, and the court imposed the aggravated term of three years in state prison. This appeal ensued.

## ISSUES ON APPEAL

Defendant contends (1) there is insufficient evidence to support a violation of section 597, subdivision (b); (2) the court erred by giving erroneous instructions on proximate cause and omitted others; (3) the court erroneously ruled a prior dog-killing admissible as other crimes evidence; and (4) defense counsel was ineffective for failing to request a mistrial when the dog-killing evidence was disclosed after the trial started and for failing to call defendant to testify after promising that he would in his opening statement.

## SUFFICIENCY OF THE EVIDENCE

Defendant claims that since the instructions given to the jury on the charged offense limited the scope of that offense only to having "caused an animal to be cruelly killed," it is his position that "the word 'cruelly' only modifies the word 'killed,' and it does not in any way modify the word 'caused.' [¶] When, as in this case, the accused does not do the direct or actual act that inflicts the death of the animal, the law only proscribes having caused the animal to be 'cruelly killed.' … Thus, if the direct and actual act of killing is not 'cruel,' there is no violation of subdivision (b) of section 597 … even if the causal conduct of the accused leading up to the direct and actual act of killing is itself 'cruel.' [¶] … [I]n this case the direct and actual act of killing (i.e., the white minivan running over the dog without apparently slowing down and then driving off without stopping) was not cruel. It is a sad fact of life that many animals, including dogs, are at times run over by cars and killed. The fact that this does occur does not make such an encounter

---

[1] Further statutory references are to the Penal Code unless otherwise stated.

[2] Section 597, subdivision (b), provides: "Except as otherwise provided in subdivision (a) or (c), every person who overdrives, overloads, drives when overloaded, overworks, tortures, torments, deprives of necessary sustenance, drink, or shelter, cruelly beats, mutilates, or cruelly kills any animal, or causes or procures any animal to be so overdriven, overloaded, driven when overloaded, overworked, tortured, tormented, deprived of necessary sustenance, drink, shelter, or to be cruelly beaten, mutilated, or cruelly killed; and whoever, having the charge or custody of any animal, either as owner or otherwise, subjects any animal to needless suffering, or inflicts unnecessary cruelty upon the animal, or in any manner abuses any animal, or fails to provide the animal with proper food, drink, or shelter or protection from the weather, or who drives, rides, or otherwise uses the animal when unfit for labor, is, for every such offense, guilty of a crime punishable as a misdemeanor or as a felony or alternatively punishable as a misdemeanor or a felony and by a fine of not more than twenty thousand dollars ($20,000)."

something that is 'cruel.' Thus, in this case, there can be no violation of subdivision (b) of section 597 ... even if defendant's behavior proceeding [*sic*] the direct and actual act of killing in this matter was in and of itself 'cruel.' In short, the statutory provision in question does not make criminal the act of cruelly causing an animal to be killed by a direct and actual act that is in and of itself not cruel."

■ An appeal of the sufficiency of the evidence requires us to review the entire record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—from which a reasonable trier of fact could find that the defendant premeditated and deliberated beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738]; *Jackson v. Virginia* (1979) 443 U.S. 307, 317–320 [61 L.Ed.2d 560, 99 S.Ct. 2781].)

The jury was instructed that "[e]very person who cruelly kills any animal or causes any animal to be cruelly killed in a grossly negligent manner is guilty of a felony cruelty to an animal." Gross negligence was defined as "negligent acts which are aggravated, reckless or flagrant and which are such a departure from what would be the conduct of an ordinarily prudent, careful person under the same circumstances as to be contrary to a proper regard for life or to constitute indifference to the consequences of those acts. The facts must be such that the consequences of the negligent acts could reasonably have been foreseen and it must appear that the death was not the result of inattention, mistake, judgment or misadventure, but the natural and probable result of an aggravated, reckless or flagrantly negligent act."

■ The prosecution had to prove that Leo's cruel death was the natural and probable result of an aggravated, reckless or flagrantly negligent act. "Cruel" means "willfully or knowingly causing pain or distress to others. 2. enjoying the pain or distress of others. ... 3. causing or marked by pain or distress: *a cruel remark; a cruel affliction* ... CRUEL implies willingness to cause pain, and indifference to suffering: *a cruel stepfather*." (The Random House Dict. of the English Language (2d ed. unabridged 1987) "cruel" p. 483, original italics.) In saying being run over by a minivan is not "cruel," defendant engages in "hypertechnical parsing" of the statute "rather than determining the reasonably likely interpretation given [it] by reasonable jurors [citation] ...." (*People v. Speegle* (1997) 53 Cal.App.4th 1405, 1413 [62 Cal.Rptr.2d 384].) Defendant ignores the aggravated, reckless, and flagrant nature of his attack on Leo and the pain and shock it inflicted. Defendant swooped down on Leo while he was in a safe place on his owner's lap inside her car, snatched him off his feet and threw him with some force from chest height about five to six feet away from the car onto a dark

roadway in a heavy rain. Initially, Leo appeared stunned to onlookers. Then, with rain pouring down on him and headlights and cars coming at him out of the dark, he appeared "terrified" as he ran through the traffic. McBurnett "could tell by his eyes he was just running scared" and described him as "crouching with his tail tucked under" as dogs do "when they're terrified or injured." The natural consequence of defendant's throwing Leo onto a dark, heavily traveled road was death from the wheels of a passing vehicle. Leo's death was cruel, that is, "marked by great pain or distress." (The Random House Dict. of the English Language, *supra*, at p. 483.) Substantial evidence established that defendant was the cause of the cruel death of Leo.

## PROXIMATE CAUSE

Next, defendant asserts that the trial court's errors in instructing the jury on proximate cause requires reversal. First, the court "totally failed" to fill in the blanks in pattern instruction CALJIC No. 3.40, which advises the jury of the specific act it needs to find resulted from the crime charged. Second, the court "totally failed to give" CALJIC No. 3.41 on concurrent proximate causes, and "totally failed to give" any instruction on what does or does not constitute an intervening, superseding cause. As a result of these errors, "the whole concept of proximate causation was never properly presented to the jury by appropriate instructions."

First, defendant asserts the court should have inserted "death of an animal" every place in the instruction where the pattern jury instruction has "____(result of the crime)____." (CALJIC No. 3.40.) The court instructed: "To constitute the crime of a violation of Penal Code Section 597[, subdivision] (b), there must be in addition to the result of the crime an unlawful act or omission which was a cause of that result of the crime. The criminal law has its own particular way of defining cause. A cause of the result of the crime is an act or omission that sets in motion a chain of events that produces as a direct, natural and probable consequence of the act or omission the result of the crime and without which the result of the crime would not occur."

Defendant did not request a more specific instruction during the trial. "[W]hen a court has generally instructed on a point, defendant must make a request for a more specific instruction or be deemed to have waived the point on appeal." (*People v. Shoals* (1992) 8 Cal.App.4th 475, 490 [10 Cal.Rptr.2d 296].) In addition, "the correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction." (*People v. Burgener* (1986) 41 Cal.3d 505, 538 [224 Cal.Rptr. 112, 714 P.2d 1251].) Thus, " '[t]he absence of an essential element in one instruction may be supplied by another or cured in light of the instructions as a whole.' " (*Id.* at p. 539.) The court

instructed that "Every person who cruelly kills any animal or causes any animal to be cruelly killed in a grossly negligent manner is guilty of a felony cruelty to an animal. [¶] In order to prove this crime, each of the following must be proved: [¶] One, that person committed a grossly negligent act or omission; [¶] Two, that act or omission caused an animal to be cruelly killed." The jury was correctly informed that it was to determine whether the result of the crime was the death of an animal. There is no basis from the record to infer that the jury was confused as to the nature of the result of the crime with which defendant was charged. The instruction as given was not erroneous.

Next, defendant claims that the Court should have given CALJIC No. 3.41 on concurrent proximate causes "which has to be given to the jury ... where defendant's conduct was not the direct and actual act that caused the death of the dog ... but was an act that allegedly set in motion a chain of events that allegedly produced the direct and actual act that caused the death of the dog. Properly worded[,] this instruction would have told the jury the following: there may be more than one cause of the death of the dog; when the conduct of two or more persons contributes concurrently as a cause of the death, the conduct of each is a cause of the death if that conduct was also a substantial factor contributing to the death; a cause is a concurrent cause if it was operative at the moment of the death of the dog and acted with another force to produce the death; if you find that the defendant's conduct was a cause of the death of the dog, then it is no defense that the conduct of some other person also contributed to the death."

Defendant did not request the instruction; now he contends it must be given sua sponte "where, as here, the evidence places in issue two or more causes for the result of the charged crime."

A case defendant cites, *People v. Bland* (2002) 28 Cal.4th 313, 334 [121 Cal.Rptr.2d 546, 48 P.3d 1107], states that the concurrent cause instruction was required there because the " 'evidence was not clear as to which of the two [defendants] fired the shots that hit each of the three victims.' " Here, it is undisputed that defendant caused Leo's presence on the roadway even though the minivan was the instrument of death. Causation was never in issue after the defense opening statement. The only issue was whether defendant acted with gross negligence, namely, whether his act was "aggravated, reckless or flagrant and which [was] such a departure from what would be the conduct of an ordinarily prudent, careful person under the same circumstances as to be contrary to a proper regard for life or to constitute indifference to the consequences of those acts. The facts must be such that the consequences of the negligent acts could reasonably have been foreseen and it must appear that the death was not the result of inattention, mistake,

judgment or misadventure, but the natural and probable result of an aggravated, reckless or flagrantly negligent act." (CALJIC No. 3.36.)

The *Bland* court stated that even if the concurrent cause instruction should have been given, the error was harmless "under any standard" because "defendant's personal discharge of a firearm was a proximate, i.e., a substantial, factor contributing to the result." (*People v. Bland, supra*, 28 Cal.4th at p. 338.) Similarly, here, defendant's action was a substantial factor contributing to Leo's death. There is no question that, but for defendant's action, Leo would not have been killed. (*People v. Bernhardt* (1963) 222 Cal.App.2d 567, 591 [35 Cal.Rptr. 401].) Omission of the instruction was not prejudicial.

Finally, defendant contends that the court should have instructed on an intervening, superseding cause such as the pattern instruction BAJI No. 3.79. Defendant states that "[i]n general, an independent intervening cause will absolve a defendant of criminal liability. In order to be an independent intervening cause that cause must be unforeseeable and an extraordinary and abnormal occurrence, which rises to the level of an exonerating, superseding cause." Defendant claims "there was more than enough evidence for the jury to be able to determine, under properly given instructions, that the ultimate killing of the dog by the oncoming white minivan was an intervening, superseding act relieving defendant of criminal liability." Defendant blames Leo because "[t]he facts show that the dog, without any apparent significant injury resulting from defendant's throwing action, successfully made it through the oncoming traffic and got to, or almost to, the curb on the other side of the street. Instead of getting onto the curb and in a place of clear safety, the dog inexplicably turned around and proceeded back into the southbound traffic where it eventually was hit by a white minivan that neither slowed down nor stopped."

" '[P]roximate cause is clearly established where the act is directly connected with the resulting injury, with no intervening force operating.' " (*People v. Schmies* (1996) 44 Cal.App.4th 38, 48–49 [51 Cal.Rptr.2d 185].) An intervening, superseding cause can relieve a defendant of criminal liability if the act "break[s] the chain of causation" (*People v. Wattier* (1996) 51 Cal.App.4th 948, 953 [59 Cal.Rptr.2d 483]) and the defendant's act is no longer a substantial factor in producing the injury. Contrary to defendant's assertion, the minivan did not break the chain of causation.

"A 'cause of the [death of the decedent] is an act or omission that sets in motion a chain of events that produces as a direct, natural and probable consequence of the act or omission the [death] and without which the [death] would not occur.' " (*People v. Schmies, supra*, 44 Cal.App.4th at p. 48.) There is no duty to instruct on an intervening, superseding event when

that event is foreseeable. (*Bunton v. Arizona Pacific Tanklines* (1983) 141 Cal.App.3d 210, 221–222 [190 Cal.Rptr. 295].) It was eminently foreseeable that a vehicle would come along a heavily traveled roadway, that the driver would not be expecting the presence of a little dog on such a roadway at 8:00 p.m. on a stormy winter night, and that the driver's ability to see would be reduced by the rain, the dark, and the presence of other traffic. Under these circumstances, it is reasonably foreseeable that the driver would not see the little white dog and run over it.

Defendant's claim that Leo had reached a point of safety on the other side of the roadway and that his "inexplicable" decision to turn around and cross the road again constituted an intervening, superseding cause is absurd. Leo was stunned, terrified, and confused by being thrown to the ground. He reacted to fright by running. McBurnett was running after him. If Leo was in any condition to realize that McBurnett was trying to get to him, she would be perceived as a place of safety and it would be reasonable to expect him to try to get to her. As in *People v. Armitage* (1987) 194 Cal.App.3d 405, 421 [239 Cal.Rptr. 515] (*Armitage*), where the defendant caused a drunken victim to end up in the middle of a dangerous river clinging to an overturned boat, and Armitage claimed that it was reckless for the victim to abandon the relative safety of the boat and attempt to swim to shore, defendant here contends that Leo, who was disoriented and terrified, should have rationally remained at the relative safety of the curb.

The Court of Appeal rejected this claim in *Armitage*, stating, "the panic-stricken victim['s] [response] … was not a wholly abnormal reaction to the perceived peril of drowning." (*Armitage, supra,* 194 Cal.App.3d at p. 421.) "[I]n criminal law a victim's predictable effort to escape a peril created by the defendant is not considered a superseding cause of the ensuing injury or death. [Citations.] As leading commentators have explained it, an unreflective act in response to a peril created by defendant will not break a causal connection. In such a case, the actor has a choice, but his act is nonetheless unconsidered. 'When defendant's conduct causes panic an act done under the influence of panic or extreme fear will not negative causal connection unless the reaction is wholly abnormal.' [Citation.]" (*Ibid.*)

Here, because of defendant's act, not only Leo, but McBurnett also, was exposed to the perils of traffic on Airport Boulevard. As demonstrated by McBurnett's own behavior, even a human would predictably risk serious injury to cross traffic and get to a loved one. By defendant's own account, McBurnett dodged several cars and risked great harm in her haste to get to Leo. Leo's behavior, running away from defendant and then back towards McBurnett, was foreseeable. Because Leo's death was foreseeable, and but for defendant's actions he would not have been killed, there is no doubt that

defendant was a proximate cause of Leo's death. The driver of the minivan did not act in an unforeseeable, unpredictable, or statistically extremely improbable manner in driving on Airport Boulevard so as to constitute a superseding cause of death. (See *People v. Schmies, supra*, 44 Cal.App.4th at pp. 49-50.)

Even if the trial court should have instructed the jury on concurrent causation and intervening, superseding acts, any error was harmless. No reasonable jury could have found that defendant's actions were not a substantial factor in causing Leo's death or that Leo's death was unforeseeable. (See *People v. Bland, supra*, 28 Cal.4th at p. 338.) Because the jury would have found defendant guilty even if it was given the additional instructions defendant claims here are necessary, the result would not have been more favorable to defendant. There was no prejudice.

## OTHER CRIMES EVIDENCE

Next, defendant claims that the court committed prejudicial error in ruling admissible evidence that in 1995 while he was a Navy military policeman in Puerto Rico, he beat a stray dog to death. Investigators had found Audrey Warren of San Antonio, Texas, who was chief of police at the naval base in Puerto Rico at the time of the incident. She did not see the beating, but she apparently saw the dog's body. She also spoke to defendant about the incident. Defendant told her, "[I]t was something that needed to be done, to put the dog out of his misery because he was a stray dog." She also remembered defendant saying, "[I]t was just a stray dog, what does it matter, it was the best thing for him."

The evidence was disclosed to the defense the morning of the last day of the prosecution's case-in-chief. The court granted a one-week continuance, and tentatively ruled that the evidence was admissible if defense evidence was consistent with defense counsel's opening statement. Defense counsel had stated that defendant would testify that after he got in front of McBurnett, her vehicle tapped his SUV twice on the rear bumper. Defendant believed that as a result of the second tap some damage had been done to his vehicle, so he got out, went back to McBurnett, leaned in, and made the comment, "you tapped my bumper, what are you thinking, pull over." And when he did this, he pointed, and part of his arm was in the car. Unexpectedly a dog sitting on McBurnett's lap snapped at defendant and bit his hand. He "instinctively jerked back," and "the tooth of the dog snagged. And he will characterize it sort of like a fish hook would snag on." He grabbed the dog and tossed it to the ground. He then walked back to his vehicle, did not look around, got into his vehicle, waited for the light to turn green, and made a right-hand turn. Defendant was unaware of what occurred thereafter.

Before the trial resumed, the court held a hearing on the admissibility of the evidence. Thereafter, it again ruled tentatively that if defendant testified at trial consistently with his counsel's opening statement, Audrey Warren's anticipated testimony would be relevant and admissible under section 1101 of the Evidence Code, and would not be more prejudicial than probative under Evidence Code section 352. When the jury returned, the defense rested without the presentation of further evidence.

Defendant claims there are "absolutely no sufficient similarities between the uncharged Puerto Rico dog incident and the charged incident in this case so as to make the former incident admissible as evidence of other uncharged crimes under section 1101 of the Evidence Code in order to negate or rebut a defense of accident or mistake."

The People claim that the ruling was not a final ruling—the trial court "indicated that it expected defense counsel to raise objections to the impeachment under both Evidence Code sections 1101[, subdivision] (b) and 352 ....[¶] ... Nevertheless, on appeal, [defendant] never acknowledges the fact that the trial court's ruling on the prior dog killing was tentative. Despite the fact that the trial court repeatedly declared that the ruling was tentative, [defendant] proceeds with his argument as if the decision was absolute. [¶] ... Therefore, [defendant]'s claim must be rejected 'at the threshold' because no definite ruling was made in the trial court. (*People v. Rowland* (1992) 4 Cal.4th 238, 259 [14 Cal.Rptr.2d 377, 841 P.2d 897].) '[T]he absence of an adverse ruling precludes any appellate challenge.' (*People v. McPeters* (1992) 2 Cal.4th 1148, 1179 [832 P.2d 146].)"

Even if the trial court's tentative ruling were subject to review, it would have to be reviewed for an abuse of discretion. (*People v. Keenan* (1988) 46 Cal.3d 478, 513 [250 Cal.Rptr. 550, 758 P.2d 1081].) Lacking complete information, the court was well within its discretion to defer its decision. (*People v. Williams* (1988) 44 Cal.3d 883, 912–913 [245 Cal.Rptr. 336, 751 P.2d 395].)

Depending on defendant's testimony, the district attorney sought to introduce evidence of the prior dog killing either to impeach defendant or to disprove any claim that the current offense was a mistake. Evidence that the defendant committed a crime, civil wrong, or other act is admissible "when relevant to prove some fact []such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident ...." (Evid. Code, § 1101, subd. (b).) "Section 1101, subdivision (b) allows evidence of uncharged misconduct when it is relevant to establish a material fact other than the person's bad character or criminal disposition. [Citation.] The admissibility of such evidence turns largely on the question whether the

uncharged acts are sufficiently similar to the charged offenses to support a reasonable inference of the material fact they are offered to prove." (*People v. Erving* (1998) 63 Cal.App.4th 652, 659–660 [73 Cal.Rptr.2d 815].)

■ The standard for evaluating the admissibility of uncharged crimes evidence under section 1101 of the Evidence Code appears to be the same standard as that used for evaluating the admissibility of other crimes evidence relating to the issue of intent. In other words, in order to be admissible to negate a defense of accident or mistake, the uncharged misconduct must be similar to the charged conduct to negate a claim of accident or mistake. (*People v. Singh* (1995) 37 Cal.App.4th 1343, 1381 [44 Cal.Rptr.2d 644].) "The least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402 [27 Cal.Rptr.2d 646, 867 P.2d 757].)

When it appeared defendant would testify that Leo bit and held onto his hand while he removed it from McBurnett's car, defendant placed his intent to remove Leo from the car at issue. The court stated, "if the defendant's testimony is consistent with the representation in opening statements, ... counsel may well be arguing that, number one, the act in question was an involuntary act, that it was an accident, a mistake, a response to a bite, something of that nature. So that places the act component of the issue, but also the mental component which we know to be gross negligence is an issue. CALJIC [No.] 3.36 reads in part, in defining gross negligence of that, it must appear that the danger was not the result of inattention, mistaken judgment or misadventure, but the natural and probable result of an aggravated, reckless or flagrantly negligent act. I think the testimony is relevant to that issue as well." The trial court's tentative ruling that the evidence was admissible was appropriate.

Defendant declares that he was prejudiced because "the trial court's erroneous ruling on the admissibility of the uncharged Puerto Rico incident kept defendant off the witness stand, emasculated defendant's defense and put defendant in a situation where there was no evidentiary support at trial for the matters related in defense counsel's opening statement to the jury concerning defendant's claim of an accident or inadvertence."

The record shows that when the trial resumed after the week-long continuance, defense counsel stated, "Your Honor, before making the decision to put my client on the stand, I'm requesting a definitive ruling on the subject of prior act[s] of moral turpitude the court previously made a tentative ruling on." These prior acts were the grand theft of a van and tools belonging to

defendant's employer, Pacific Bell,[3] and providing false documents to a traffic court in order to avoid paying speeding tickets. The district attorney mentioned the prior dog killing also, but the trial court stated, "[w]ell, of course that is a separate issue which we addressed last week." With argument strictly limited to the theft and the false documents, the court indicated that the credibility of defendant versus the other witnesses was the major issue of the case. It overruled the defense objections to the use of the two incidents.

Since there is no support in the record for defendant's claim that the tentative ruling on the prior dog killing resulted in his not testifying, and since the record contradicts this claim, defendant cannot show that it was reasonably probable that the alleged error resulted in prejudice. (See *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

## INEFFECTIVE ASSISTANCE OF COUNSEL

Finally, defendant claims that after evidence of the prior dog killing came to light, defense counsel should either have moved for a mistrial or gone ahead with the original plan to have defendant testify. Defendant claims that allowing the prosecution to use the prior-dog-killing evidence "constituted an unfair surprise at trial which at a minimum required defendant's trial counsel to move for a mistrial." In addition, when defense counsel gave an opening statement containing promises and indications as to the anticipated testimony of an important defense witness and then failed to call the witness, counsel "opened the gate to legitimate, devastating comments on the part of the prosecution ... on the failure of the defense to provide the promised evidence and thereby dealt a devastating blow to [defendant's] cause." (*People v. Corona* (1978) 80 Cal.App.3d 684, 725–726 [145 Cal.Rptr. 894].) Defendant asserts that a decision not to call a witness, under circumstances where the jury was told of the anticipated testimony of a critical defense witness and then that testimony is never produced, cannot be "disregarded as harmless. [It is] prejudicial as [a] matter of law." (*Anderson v. Butler* (1st Cir. 1988) 858 F.2d 16, 19.) The People point out that intermediate level federal cases are not precedent and only persuasive authority in this court. (*People v. Bradley* (1969) 1 Cal.3d 80, 86 [81 Cal.Rptr. 457, 460 P.2d 129].)

In order to prove ineffective assistance of counsel, defendant has the burden of showing: "(1) trial counsel failed to act in the manner to be expected of reasonably competent attorneys acting as diligent advocates and (2) it is reasonably probable that a more favorable determination would have resulted in the absence of counsel's failings." (*People v. Lewis* (1990) 50 Cal.3d 262, 288 [266 Cal.Rptr. 834, 786 P.2d 892].)

---

[3] Defendant's conviction on this incident is currently before this court in case No. H023595.

In this case, it would have been futile for counsel to move for a mistrial because the prior-dog-killing evidence was tentatively ruled admissible. The trial court gave the defense a week to prepare to meet the testimony. At a hearing on the Thursday before the trial resumed, the court indicated that when Audrey Warren appeared to testify, the court would allow a hearing out of the presence of the jury to determine if her testimony would be consistent with the version proffered by the district attorney.

Defense counsel indicated he contacted three witnesses who lived in Texas, Iowa, and Oregon who had information to the contrary of what Ms. Warren would say. Defendant also stated information contained in defendant's Navy file could be used to discredit Ms. Warren. However, defense counsel stated it would take four to eight weeks to get the Navy file. Defense counsel stated effective cross-examination of the dog-killing witnesses "would necessitate a significant continuance."

The court responded, "Well, it will necessitate you requesting a significant continuance. Whether you are going to get a significant continuance is an altogether different question." The court reiterated that its ruling on the admissibility of the dog-killing evidence was tentative and that the court anticipated that the objection would be raised again. The court concluded, "[t]o the extent you come across witnesses that arguably can impeach this person, I suggest travel arrangements be made for them to be here next week."

In light of the court's accommodation of the defense's need for time to investigate the prior-dog-killing, and counsel's indication that he had witnesses who could be brought to California for the trial to impeach prosecution witness Audrey Warren, there would have been no reason for the trial court to grant a mistrial. Defendant has not shown that defense counsel's failure to request a mistrial was "grounded in ignorance or misapplication of the law rather than tactical considerations [citations] and [that] the motion for mistrial bore strong potential for success." (*People v. Haskett* (1982) 30 Cal.3d 841, 854–855 [180 Cal.Rptr. 640, 640 P.2d 776].) Counsel was not ineffective for failing to request a mistrial.

Next, defendant claims that defense counsel should have allowed him to testify even though he would have been impeached with the prior dog killing. Defendant passes over the fact that he would have been impeached with the prior theft and production of false documents to a court.

There is no indication defense counsel did not act within his professional discretion in advising defendant not to testify. Defendant's credibility was already damaged by the evidence that he had fled the scene of the crime; had

hidden from authorities for over a year, changing his appearance to do so; had tried to hide his SUV and changed the license plates on it; and had advised his mother and girlfriend in conversations taped by the jail and played in court not to cooperate with police. In addition, his fiancée called McBurnett to find out if the police suspected that defendant committed the crime, and his cousin admitted lying for him in front of the grand jury. What credibility the defense had left would have been demolished by evidence that defendant stole from his employer and lied to a court.

In addition, defendant's proposed testimony that Leo's tooth got stuck in his finger was, as the trial court stated at sentencing, "unbelievable .... The notion that he approached the victims, and I regard Mrs. McBurnett as a victim, and gestured because he was concerned about a minor traffic accident and suddenly a dog who had never bit anyone in its entire life lunged at the defendant, bit him and then his tooth was stuck to the defendant's hand and the defendant pulled out a 19-pound dog that then fell to the ground. That's absolutely ridiculous. It is insulting to my intelligence, it's insulting to the intelligence of any person who thinks. It's preposterous. And it's an indication ... of guilt and it fits a pattern, a consistent pattern that I observed based on the evidence establishing that [defendant] is a liar." This reaction to the proposed testimony clearly indicates that if defendant testified he would only have further antagonized the jurors and the trial court.

■ When a defendant claims ineffective assistance, the reviewing court may not second-guess trial counsel if the record indicates that he or she made a reasonable tactical decision. (*People v. Kelly* (1992) 1 Cal.4th 495, 520 [3 Cal.Rptr.2d 677, 822 P.2d 385].) The evidence already presented at trial both of the event and defendant's attempts to cover it up, the impeachment evidence of defendant's crimes of moral turpitude, the evidence of the prior dog killing, and defendant's proffered testimony of an "insulting," "preposterous" version of the events were all reasonable factors for counsel to consider in deciding whether defendant should testify. Defendant apparently led defense counsel to believe that Leo bit him and his tooth snagged on defendant's finger. When all of the witnesses testified that this did not happen, including the only defense witness, George "Rusty" Tomer, whom defense counsel told the jury he expected to corroborate the testimony of defendant but who instead testified consistently with prosecution witnesses, defense counsel was compelled to change course. "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant." (*Strickland v. Washington* (1984) 466 U.S. 668, 691 [80 L.Ed.2d 674, 104 S.Ct. 2052].) It is not defense counsel's fault that defendant lied to him. Nor is it counsel's fault that he told the jury that he would present evidence which, apparently during the course of the trial, he

discovered was a lie. Once the trial court ruled that defendant's credibility could be impeached with even more damaging evidence, there was little point in engaging in a credibility duel which could only disadvantage defendant with the trial court.

■ Making promises about the defense evidence in opening statement and then failing to deliver does not constitute ineffective assistance per se. In *Harris v. Reed* (1990) 894 F.2d 871, 879, the ineffective assistance arose not from defense counsel's unkept promise to present a defense theory, but because counsel decided not to present witnesses without ever interviewing them and without consulting with defendant. That situation is different from "instance[s] where counsel chose, as a matter of sound trial strategy, not to put on any defense because the defense theory was an 'incredible' one." (*Id.* at p. 878, fn. 8.) Here, the defense was an incredible one. Counsel's advice "was an appropriate exercise of his decisionmaking responsibilities at trial." (*People v. Frye* (1998) 18 Cal.4th 894, 984 [77 Cal.Rptr.2d 25, 959 P.2d 183].) "Given defendant's decision to heed his attorneys' advice and forgo his right to testify, and in the absence of anything in the record evidencing the lack of a reasonable basis for counsel's advice not to take the witness stand, we view the challenged acts as appropriate tactical decisions, subject to great deference on appellate review." (*Ibid.*)

### DISPOSITION

The judgment is affirmed.

Rushing, P. J., and Elia, J., concurred.

A petition for a rehearing was denied August 19, 2003, and appellant's petition for review by the Supreme Court was denied October 1, 2003.