Filed 4/12/16  P. v. Luna CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>JUAN ANTONIO LUNA,<br><br>        Defendant and Appellant. | A141622<br><br>(Contra Costa County<br>Super. Ct. No. 051221514) |

Defendant Juan Luna appeals from the judgment on a jury verdict convicting him of aggravated sexual assault of a child by foreign object penetration and committing a lewd act upon the body of a child under 14 years of age, both charges stemming from defendant's sexual assault of his stepdaughter, Jane Doe.  During opening statement, defendant's counsel acknowledged an "awkward moment" between defendant and Doe, but told the jury it would hear evidence that the moment was an accidental touching of defendant's penis to Doe's back in an incident that left defendant "embarrassed" and that he promised would never happen again.  Defense counsel presented no such evidence, however, an omission that defendant contends constituted ineffective assistance of counsel.  We disagree, and we affirm.

## EVIDENCE AT TRIAL

### Jane Doe's Initial Statements to the Police

On October 2, 2012, Pittsburg Police Officer Michael Sibbitt and his partner responded to a call from Hillview Middle School regarding a report of potential child molestation.  They met with Doe, who was then 12 years old, interviewing her in a

1

conference room next to the principal's office. She was initially forthcoming and open when discussing her background and interests, but became very shy and nervous when describing three separate incidents involving defendant.

The first incident occurred about three weeks before school started on August 29, 2012. Doe went into the garage that night to help defendant with his online bill-paying. Because he was not fluent in English, she often translated for him. Defendant was wearing a poncho, and Doe believed he had no clothing on underneath because she could see his bare thighs. She sat down in a chair in front of the computer, and defendant sat down right next to her, which was uncommon. He placed one arm around her shoulder, and she felt him place his other hand on her thigh, which made her uncomfortable. Because she felt very nervous, she got up and went to the bathroom. When she came out, she told defendant she was going to go to bed. He got out of his chair, and she could see his penis underneath the poncho. He told her to stop, stood in front of her, pulled her pants down, and spun her around. He forced her to bend over, and she felt his erect penis enter her buttocks and press against, but not enter, her anus. She felt pain and realized he had "raped" her, so she pulled up her pants and ran into the house. In the bathroom, she pulled her pants down, wiped her crotch, and noticed she was very "wet down there." The following morning, defendant came into her bedroom and told her not to tell anybody what had happened because he did not want to get in trouble.

A second incident happened the weekend after school had started. Doe was again in the garage helping defendant pay bills, when he sat down next to her wearing nothing but his poncho. He grabbed her pants and pulled them down to her knees. Fearing he was going to assault her again, she pulled her pants up and ran into the house.

The third incident occurred on September 30, 2012. Doe was home with her younger sister and defendant, and the two girls were watching television. Defendant told Doe's sister to take a shower so she went into the bathroom. From where Doe was sitting on the couch, she had a clear view of the bathroom door. After about 10 minutes, Doe heard the water turn off and then saw defendant go into the bathroom and shut the door while her sister was still in there. She heard the water turn back on and the shower door

2

open and close.  Another ten minutes later, she heard the water turn off and the shower door open and close again.  Her sister, crying and wearing nothing but a towel draped over her shoulders, ran out of the bathroom and into her bedroom.  Doe saw redness on her bottom.  She then saw defendant, also naked and wet, leave the bathroom, using two smaller towels to cover his genitals and buttocks.  Doe told Officer Sibbitt that this incident prompted her to finally tell someone what defendant had done.

**Jane Doe's Forensic Interview**

On October 9, 2012, Doe was interviewed by forensic interviewer Pat Mori at the Child Interview Center (CIC).  The jury was shown a videotaped recording of the interview, the substance of which was this:

Doe understood she was at the CIC because she had told a counselor at school that defendant raped her.  Doe regretted telling the counselor that because it was the "biggest lie" she had ever told.  She was mad at defendant because she believed he had broken her phone but would not buy her a new one.  Now, he was in jail and she was living with her mother, siblings, and uncle, which she did not expect to happen.  She told her mother and the counselor that the story was not true, and the counselor told her she needed to tell the police, but Doe had not done so.

Doe did not know what "rape" meant.  She was studying sex education at school, but the teacher had not answered her question about it.  Her friends said it was like child abuse.

Two days after Doe talked to the counselor, someone from family services came to school and spoke to Doe about what she told her counselor.  The police then got involved.  Mori asked Doe what she told the police, and Doe responded that she told them the same thing she had told the counselor, that defendant had raped her.  The police asked about a lot of details, like about what she was wearing (a long sleeve shirt and leggings).  They asked if she felt defendant's "bottom part"—which Doe called his "thing"—go in her, and she said that it went in her "front part," where she "goes pee," and it "just felt weird . . . ."  She did not know what was going on and was thinking,

3

"[W]hat is he gonna do?  Is this something bad?"  But then she stopped thinking because she was falling asleep.

The incident happened in their garage, which was like a guest room with a computer, a small bed, a couch, and a pool table.  Defendant would do his paperwork out there, and Doe would go out there to help him with his bills because he could not write in English and needed her to translate.[1]

 That particular night, Doe had been in her room using her phone, and defendant called her on her phone and said he needed help with his papers.  When she went out to the garage, she was wearing a shirt and leggings.  Defendant was wearing a poncho, but she did not know what else he was wearing because she could not see under the poncho.  She started to help him with his bills on the computer and then was using Facebook, while defendant was sitting next to her on the couch.  She got tired and was falling asleep when defendant picked her up and put her on his leg, and she felt his thing in her.  She did not say anything because she did not really know what was going on.

Doe then abruptly told Mori that everything she said was a lie.  Mori explained to her at length that it can be confusing when someone who is like a father does something like this, that it was Mori's job to make sure Doe and other children were okay, and that Doe needed to tell the truth.  Mori told Doe that it sounded like what Doe told her had in fact happened and asked, "[S]o was that the truth that day?"  Doe responded, "Mm-mm."  Mori asked how Doe knew about the stuff she was telling her, and Doe responded that her friend said her uncle had molested her, and then all of a sudden her friend no longer went to that school.  Mori asked if what Doe said about feeling defendant's "thing" was what she told the police and the person from family services, and Doe said it was, adding, "I don't know why I said it though.  Like I was really, really mad at him."  Doe did not know why, of all the things she could have said, she had said he raped her.

After a digression to talk about unrelated topics, the discussion returned to what happened in the garage the evening in question.  Doe said the lights were off in the

---

[1] By this point in the interview, it no longer sounds as if Doe was recounting what she told the police but was instead describing what happened in the garage.

4

garage, and she and defendant were both sitting on a chair in front of the computer. He usually wore shorts but she did not know if he was then because she felt "his hair and stuff" poke her legs through her leggings. She started to fall asleep and felt him start to take her pants off so she jumped up and went to the bathroom. When she returned, defendant was no longer sitting at the computer. She sat back down and started to fall asleep again, and that was when she "felt his thing." She was on defendant's leg and then was sitting between his legs. He pulled her back and she felt him scooting forward, and then she felt his thing "in the middle," "kinda like in my butt and then it was kinda like in my front part . . . ." She guessed he had pulled her pants and underwear down. It was a "weird feeling" and she did not know what was going on. She did not want to know what was going to happen, so she got up and left.

At the time, Doe had felt like she was going crazy because she had heard her friends say they had "done it" with their boyfriends and she was wondering if this was the same thing. She described it as like those commercials where there is an angel on one side saying something bad was going to happen, while there was a devil on the other side saying something good was going to happen.

Doe told Mori that her cousin had been molested by Doe's uncle. She was taken away from her mother, and her father went to jail and then was deported. Doe's cousin believed it was all her fault, and she did not want Doe to go through the same thing. When she told Doe that, Doe thought, "I don't wanna leave my mom. I don't wanna live without my brothers and sisters 'cause it's gonna be hard for me 'cause like even though . . . people do that to me, I don't care 'cause I don't wanna live without my mom."

After Doe left the garage, she went to the bathroom and everything felt normal again.

Doe knew defendant did not want her to say anything about what happened because he told her, "I don't want you to say anything so please don't say nothing 'cause I'm scared I might get taken away from your sister . . . . I'm pretty sure I know the consequences. I'm pretty sure I might go to jail or something and I'm—might not even get to see you guys anymore." This scared Doe, who thought, "I wanna say something

5

'cause I don't want you to do it again but at the same time I don't wanna say nothing 'cause I don't want my little sister to feel the same way I felt without a dad." She sometimes worried about defendant doing something to her sister, but then thought he would not do that because he was her "real dad."

On a second occasion, Doe was again in the garage helping defendant with his paperwork at the computer. He was again sitting next to her on the couch. When he tried to pull down her leggings, she said, "No," and got up and left.

At the time of the interview, defendant was in jail, and they had to lie about why because they did not want him to lose business. It was hard for Doe because her mother and defendant's brother were telling her to lie when people usually tell her not to lie and she did not want to lie. At the same time, she did not want defendant to lose his job because of what he did.

When asked what she thought about what happened to her, Doe responded, "I think it's a bad thing that he did that but then like I know it's a bad thing and everything but I feel like it was the right thing to say something. [¶] . . . [¶] 'Cause obviously if I wanted it to stop, I—I guess you have to tell somebody about it." And when asked how she felt at the end of the interview, Doe said, "I feel better . . . [¶] about saying things . . . ."

**Jane Doe's Preliminary Hearing Testimony**

At a preliminary hearing on December 12, 2012, Doe was accompanied to the stand by Crystal Carey, a victim's advocate with the Contra Costa County District Attorney's Office. At the hearing, Doe testified that defendant did not touch her inappropriately. The court then took a break, and Doe went outside with Carey and the prosecutor. Doe was sad, crying, and very shy. According to Carey's testimony at trial, she and the prosecutor attempted to comfort Doe and make her feel okay. The prosecutor nonconfrontationally asked Doe why she had testified the way she did, but Carey did not recall Doe's response.

Doe then returned to the courtroom and took the stand again. The prosecutor asked her if there was something she would like to tell the judge, and Doe turned to the

6

judge and said, "I lied." According to Carey, the judge asked if she had lied because she was worried about her family, and Doe nodded her head. She shook her head when asked if she did not want to be taken away.

Doe testified at trial, however, that the reason she told the judge she had lied at the preliminary hearing was because during the break, one of the women—presumably the prosecutor—asked her why she had lied, and she responded that she had told the truth. The woman then told her to go back into the courtroom and tell the judge she had lied. She got upset because she had to say she had been lying when everything she had said was the truth. Carey denied at trial that either she or the prosecutor accused Doe of lying and demanded she go back into the courtroom and tell the judge she had lied.

**Jane Doe's Trial Testimony**

In August 2012, 12-year-old Doe was living in a house in Pittsburg with her sister, brother, mother, and defendant (whom she referred to as her dad, although he was her stepfather). Her mother, who spoke only Spanish, cleaned homes, and defendant, who spoke a little English, had his own landscaping business. Because Doe spoke both Spanish and English, she sometimes translated for her parents. The house had a garage that had been converted into an office with a computer and a bathroom.

The night in question, Doe went to the garage to help defendant with his bills on the computer. She thought he was wearing a poncho, although she did not "really remember." She sat down in a chair and helped him with one bill and then went to her room because she was falling asleep.

Doe initially claimed that she did not recall speaking to the police in August 2012 about an incident involving defendant. She then acknowledged speaking to the police and telling them something happened while she was in the garage, "that there was a little problem . . . ." She did not remember what she told them, however, and she specifically did not remember telling them that defendant was wearing a poncho with nothing underneath, that he touched her private area, that she felt something on her thigh when she was sitting next to him, that she was nervous and did not want to look down to see what was on her thigh, or that she went to the bathroom before going to bed and felt

7

something wet when she wiped her private area. She denied that defendant had touched her anywhere near her private area or that the next morning he told her not to talk about what happened in the garage. Doe also testified she did not remember telling an interviewer at CIC that defendant touched her in her private areas when they were in the garage.

Doe remembered telling the police about another time—this one, the first weekend after school started—when she was in the garage helping defendant translate a bill that was on the computer. Nothing else happened other than that she helped him pay bills. He was not wearing the poncho that time, and she did not remember telling the police that he was, nor did she remember telling the police that he grabbed her pants and pulled them down or that she got scared and ran out of the garage.

Concerning a third incident in late September, Doe testified that her mother was going to the store and Doe stayed home with her siblings and defendant. Her mother told the children to take showers while she was gone and then left. Doe took the first shower and then sat on the couch watching television while her sister showered. After her sister was done with her shower, their mother returned from the store. Doe did not see defendant go into the bathroom or get in the shower while Doe's sister was in there, and she did not remember telling anyone that something else had happened or that she was scared for her sister.

Doe remembered talking to a counselor at school, but she told her that a friend was being molested by her father, not that she was being molested by defendant. Doe speculated that the counselor misunderstood and thought she was talking about herself. At some point, a police officer arrived at school, and Doe was "pretty sure" she made it clear to him that she was not talking about herself but someone else.

Doe testified that she did not remember telling the CIC interviewer that defendant had molested her, rather than that the incident involved a friend. She claimed she felt pressured to change her story to say that it was about her because the interviewer "looked mean" and seemed as if she was going to tell her to lie. Doe did recall telling the interviewer about a cousin who was molested by her father and when she told someone

8

about it, the father was deported to Mexico and the whole family was separated. Doe did not remember talking to her cousin about what defendant had done and the cousin telling her that she did not want Doe to go through the same thing. Doe did not remember telling the interviewer that even though she had been molested, she wanted her family to stay together, nor did she tell the interviewer that her mother and uncle were telling her to lie about what happened for defendant's good.

Doe did not remember telling her cousin that she lied to the police because of a cell phone. She remembered that just before school started, she was mad because her mother broke her cell phone. Although she claimed she always knew her mother broke her phone because she threw it against the wall in front of her, she told her mother she was mad at defendant because she thought he was the one who broke the phone.

**Forensic Evidence**

The police recovered defendant's poncho from the garage. An analysis of the poncho revealed a substance that the laboratory technician was "very confident" was semen.

**Child Sexual Abuse Expert Anthony Urquiza**

Child sexual abuse expert Anthony Urquiza testified about child sexual abuse accommodation syndrome, which was the subject of a 1983 journal article written to dispel misperceptions about sexual abuse. One such myth is that children should be wary of strangers, because in fact children are most often sexually abused by someone with whom they have an ongoing relationship. Another myth is that if a child is sexually abused, he or she is going to disclose that abuse right away, when in fact most children keep it a secret and delay disclosure. Another myth is that if a child is sexually abused, there will be an outward indication that something is wrong.

Urquiza testified that one of the reasons children delay in disclosing abuse is because of a fear of something bad happening to either themselves or the abuser, who is often someone important to them, such as a parent. A consequence of disclosing is often retraction, or taking back the allegations of abuse, because of familial pressure.

Another myth is that a child who is talking about sexual abuse will be distraught, when in fact children who have been sexually abused often suppress any feelings of embarrassment, humiliation, shame, or disgust. This leads to dissociation from the reality of what happened, such that when discussing what happened, they have a flat affect.

When a child does disclose sexual abuse, it is not always a full disclosure of what happened. The child may offer a vague statement to see how the listener reacts; if the reaction is supportive, the child may feel comfortable to disclose more, often leading to multiple versions of the abuse with different information.

**Raquel F.**

Raquel F, Doe's mother, testified that defendant was not Doe's biological father, but he had been in her life for nine years and they had a father/daughter relationship. Raquel F. and defendant also had a child together—Doe's younger sister—and they shared parenting responsibilities for both of the children. Both parents showered with the younger daughter because she did not know how to do it herself, although defendant would keep his underpants on when he bathed his daughter.

After Doe's allegations came out, Raquel F. asked Doe if something happened between her and defendant and if she had seen defendant's private parts. Doe answered no to both questions. Raquel F. asked Doe why she made the statements to the school officials, and Doe said that a friend had told her she was being abused and Doe related that to her school counselor, but the counselor misunderstood and thought she was talking about herself.

Raquel F. described an incident involving Doe's cell phone, when she caught Doe talking on the phone at 2:00 a.m. so she took the phone away. On another occasion two weeks before the police got involved in this case, she caught Doe having a conversation that was inappropriate for a girl of her age, so she took the phone and broke it on the floor.

Raquel F. testified that she would sometimes go into the garage when defendant was in there, and the two would have sex while defendant was wearing his poncho. This happened two days before defendant was arrested.

10

Raquel F. acknowledged that her brother-in-law was deported after he molested Raquel F.'s nieces, and the children were split up. She denied she ever told Doe to lie about what happened with defendant.

**N.Z.**

N.Z., Raquel F.'s niece, spoke with Doe sometime after the preliminary hearing. N.Z. asked Doe how the court proceeding had gone, and Doe said she was nervous and scared and had cried. N.Z. never asked Doe what she said in her testimony, but when she asked her, "Why did you do it?", Doe replied that she was mad because her parents had broken her cell phone. N.Z. then encouraged her to be strong and tell the truth.

## BACKGROUND

### The Charges Against Defendant

Defendant was charged with aggravated sexual assault of a child by foreign object penetration (Pen. Code, § 269, subd. (a)(5)) and commission of a lewd act upon the body of a child under 14 years of age (*id.*, § 288, subd. (a)). It was further alleged that defendant had substantial sexual conduct with Doe, who was under the age of 14 (*id.*, § 1203.066, subd. (a)(8)), and that he committed the offenses by use of force, violence, duress, menace, or fear of immediate and unlawful bodily injury (*id.*, § 1203.065, subd. (a)).

### Defense Counsel's Opening Statement

Prior to the start of testimony, both sides gave opening statements. The following passage in defense counsel's opening statement is at the heart of defendant's appeal:

"Now, that's not to say that in this case there wasn't an awkward moment between the minor and Mr. Luna. It is true that Mr. Luna always pays his bills—he's a—you're gonna hear that he's a self-employed man, landscaper business. After work he comes home, takes off his clothes, puts on new clothes and dons a poncho and goes in the garage, and he does his work on his computer as much as he can. And he wears the poncho because sometimes it's cold in the garage.

11

"And the minor helps him relatively every day because his English is not that good, doesn't read and write well.  He understands, but when it comes to billing and paying bills online, he needs her help.  So she helps him out every day.

"Now, there was a day in which she did—she was helping him pay the bills.  Now, after they were done paying the bills, from my recollection of the evidence, is that she takes off, probably go uses the bathroom, get ready for bed.  Mr. Luna, meanwhile, stays in the garage.  He's playing around on the Internet.  He himself says that he saw some girls online, got aroused, and then soon thereafter the minor comes back.  She comes back real briefly and says, 'Okay, I'm gonna go to bed,' and starts walking out.

"Mr. Luna then gets up, follows her, gives her a hug from behind, tells her good night, she loves you, and he feels his penis touch her back area.  Immediately not a second later, he pushed her off, said, 'I'm sorry.'  He was embarrassed, told her he was sorry, that will never happen again."

No evidence was presented at trial that supported this statement.

**Closing Arguments**

In his closing argument, the prosecutor made this argument:

"Opening statements.  Opening statements are a chance to tell you what the case is about.  And based on the openings, I don't think defense is gonna claim that he didn't touch her with his penis.  Going back in your mind, what did they say happened in this case?

"All right.  I've got the transcripts on opening.  'The defendant did get aroused.' These are their words.  'He did get aroused, he did hug her from behind, he was aroused, and his penis touched her back area.  And he said this would never happen again.'

"So I'm not sure exactly what the defense is gonna say now, but that was their opening.  These are the things that, the very least, they said happened.  That's their chance to tell you about the case, and they're saying, 'Oh, at the very least, these things happened.  He was aroused.  He did come in from behind.  He did touch her with his penis.'  Keep that in mind when you're thinking about this case.  They're conceding that; that at least that happened in that garage."

In his closing argument, defense counsel stated:

"Opening statements. Opening statements is not evidence. It's—when you have a case, we study it, but—and it's what we think. And sometimes we have to anticipate things. Sometimes we don't know it all. The District Attorney doesn't know what's going to be said.

"So, you know, sometimes we have to adapt to what's going on in the trial because we really don't know. So, you know, same as we had anticipation of what was going to—what was going to be presented. A lot of that stuff didn't work out. A lot of that stuff wasn't presented or some of the evidence didn't come out the way me or the District Attorney wanted it to. It's just the name of this game, unfortunately, and you guys have a tougher job of figuring out what's the reality here."

**Defendant's Conviction and Sentence**

A jury found defendant guilty of both charges and the special allegations true. He was sentenced to 15 years to life on count one, with a concurrent six-year term on count two.

**DISCUSSION**

In *People v. Mackey* (2015) 233 Cal.App.4th 32, 119, we recently summarized the well-established standard for a successful ineffective assistance of counsel claim: "A defendant claiming ineffective assistance of counsel must demonstrate both deficient performance and resulting prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687, 691–692 (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 216–218.) On the first prong he must show that 'counsel's representation fell below an objective standard of reasonableness . . . [¶] . . . under prevailing professional norms.' (*Strickland, supra,* at p. 688.) And under the second, he must show that in the absence of the error it is reasonably probable that a result more favorable to him would have obtained. A reasonable probability is 'a probability sufficient to undermine confidence in the outcome.' (*Id.* at p. 694.)" As in *Mackey*, defendant here demonstrates neither deficient conduct nor prejudice.

Turning first to the question of whether defendant's counsel's performance was deficient, we consider whether the record shows that counsel's act or omission "resulted from an informed tactical choice within the range of reasonable competence . . . ." (*People v. Pope* (1979) 23 Cal.3d 412, 425.) If so, the conviction must be affirmed. (*Ibid.*) But if no plausible tactical explanation can be conceived which would justify the challenged act or omission, then deficient conduct by counsel is manifest. (*People v. Robertson* (1982) 33 Cal.3d 21, 42; *People v. Moreno* (1987) 188 Cal.App.3d 1179, 1181; *People v. Jackson* (1986) 187 Cal.App.3d 499, 506; *People v. Guizar* (1986) 180 Cal.App.3d 487, 492, fn. 3.)

In the context of an opening statement, "Making promises about the defense evidence in opening statement and then failing to deliver does not constitute ineffective assistance per se." (*People v. Burnett* (2003) 110 Cal.App.4th 868, 885.) Courts have, however, found constitutionally ineffective assistance of counsel where defense counsel failed to present exculpatory evidence that was promised in an opening statement and no intervening circumstance justified the failure to deliver on the promise. Defendant cites a string of such cases: *Williams v. Woodford* (E.D. Cal. 2012) 859 F.Supp.2d 1154, 1171–1173; *U.S. ex rel. Hampton v. Leibach* (7th Cir. 2003) 347 F.3d 219, 259 (*Hampton*); *Anderson v. Butler* (1st Cir. 1988) 858 F.2d 16, 17; *People v. Corona* (1978) 80 Cal.App.3d 684; *Madrigal v. Yates* (C.D. Cal. 2009) 662 F.Supp.2d 1162, 1184; *Ouber v. Guarino* (1st Cir. 2002) 293 F.3d 19, 29; *Harris v. Reed* (7th Cir. 1990) 894 F.2d 871, 879. He contends these cases, in particular *Hampton*, govern here. Not so.

In *Hampton*, *supra*, 347 F.3d 219, defendant was charged with sexual assault, rape, and robbery, stemming from an assault on two women at a concert by a large group of gang members. Defendant was tied to the crimes solely by conflicting eyewitness testimony. During opening statement, defendant's counsel promised the jury, "Mr. Hampton will testify and tell you that he was at the concert. Mr. Hampton will tell you that he saw what happened but was not involved with it." (*Id.* at p. 257.) The attorney later decided not to call defendant to the stand because he was worried that the fact

14

defendant was at the concert might make him, in the jury's eyes, guilty by association. (*Id.* at p. 258.)

In agreeing with defendant's claim of ineffective assistance of counsel, the court of appeals stated: "We may assume, without deciding, that it was reasonable for [counsel] Rodgon to advise Hampton not to testify and not to present testimony from other witnesses about his lack of gang ties; such decisions are often motivated by strategic considerations that command deference from the judiciary. [Citations.] But Rodgon promised the jury that it would hear from Hampton and that it would also hear evidence that he had no gang involvement, and he reneged on his promises without explaining to the jury why he did so. Turnabouts of this sort may be justified when 'unexpected developments . . . warrant . . . changes in previously announced trial strategies.' [Citations.] However, when the failure to present the promised testimony cannot be chalked up to unforeseeable events, the attorney's broken promise may be unreasonable, for 'little is more damaging than to fail to produce important evidence that had been promised in an opening.' [Citations.] The damage can be particularly acute when it is the defendant himself whose testimony fails to materialize: [¶] [']When a jury is promised that it will hear the defendant's story from the defendant's own lips, and the defendant then reneges, common sense suggests that the course of trial may be profoundly altered. A broken promise of this magnitude taints both the lawyer who vouchsafed it and the client on whose behalf it was made.['] [Citation.]" (*Hampton, supra,* 347 F.3d at p. 257.)

The *Hampton* court then went on to find that any potential disadvantages from defendant's testimony were ones "that would have been obvious from the outset of the case" and thus did not justify counsel's decision to promise the jury that defendant would testify and then renege on that promise. (*Hampton, supra,* 347 F.3d at p. 258.)

Here, unlike in *Hampton*, there was an unforeseeable event that justified a change in trial strategy: Doe's retraction. Doe told a school counselor, the police, and CIC interviewer Mori that defendant had sexually assaulted her. She testified at the preliminary hearing that he had not touched her inappropriately, only to return to the

15

courtroom a little while later and tell the judge that she had lied. Defense counsel thus had every reason to believe Doe would testify at trial about the incident in the garage, and it was reasonable to inform the jury it would hear evidence of an innocent explanation for the physical contact Doe would presumably describe. The promised evidence was apparently consistent with what defendant, after initially proclaiming his innocence, told the police—"that his 'penis' did come into contact with Jane Doe's 'cheeks,' but claimed he did not penetrate her."[2] When Doe took the stand and denied that any contact, let alone any sexual assault, occurred, defendant's anticipated testimony no longer made sense, and in fact would have been damaging to the defense. In light of this plausible tactical explanation for counsel's decision, we cannot conclude that his conduct was deficient.

Even if we agreed with defendant that his counsel's opening statement fell below an objective standard of reasonableness, defendant would still not prevail on his ineffective assistance of counsel claim because he cannot demonstrate prejudice, i.e., a reasonable probability of a more favorable result but for the deficient conduct. (*Strickland, supra,* 466 U.S. at pp. 687–691.) He contends that, "Given the wildly divergent statements and testimony from [Doe] during the course of the investigation and trial, the evidence of [defendant's] guilt was far from overwhelming." We read the record very differently: there was, in fact, overwhelming evidence of defendant's guilt.

As detailed above, Doe told three different adults that defendant had sexually assaulted her, describing the assault in significant detail. At the preliminary hearing, she denied any inappropriate touching, but then told the judge she had not been truthful, agreeing that she had lied because she was worried about her family. And her trial testimony—for example, her claim that she had actually reported that a friend had been molested and her claims that she did not remember telling the police or Mori any details about the incident—was unpersuasive.

---

[2] This is per the probation officer's report and recommendation.

16

Further, the only explanation Doe ever offered as to why she supposedly lied about the sexual assault was her claim that she was mad at defendant because she believed he broke her phone. But this was contradicted by her own trial testimony, corroborated by her mother, that her mother broke the phone in front of her. There was thus no credible reason why Doe would have fabricated the sexual assault story.

Defendant would have us focus on what he describes as Doe's "wildly divergent statements," but there were reasonable explanations for any inconsistencies in Doe's accounts, as well as her retraction at trial. Child sexual abuse expert Urquiza testified about child sexual abuse accommodation syndrome, explaining that children often retract reports of abuse because of familial pressure. Consistent with that, Doe told Mori that her mother and defendant's brother were telling her to lie about what happened. There was also evidence that Doe's cousin's report of sexual abuse ultimately led to her father's deportation and the separation of the family. When asked by the preliminary hearing judge if she had lied because she was worried about her family, Doe nodded her head. Likewise, Doe told Mori that she did not want to live without her mother and siblings, despite what had happened to her.

Urquiza also testified that a child victim of sexual abuse does not typically make a full disclosure at the outset, instead offering a vague statement, assessing the listener's reaction, and then adding details if the listener is supportive. This provided a reasonable explanation for why Doe's account evolved each time she described the assault to an adult.

In light of this evidence, defendant cannot demonstrate there was a reasonable probability of a more favorable result had defense counsel not suggested in his opening statement that it would hear evidence of an innocent explanation for the "awkward moment" between defendant and Doe.

## DISPOSITION

The judgment of conviction is affirmed.

17

_____
Richman, Acting P.J.

We concur:


_____
Stewart, J.


_____
Miller, J.