Filed 6/12/15  P. v. Mejia CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>MARCO MEJIA,<br><br>Defendant and Appellant. | A139777<br><br>(San Francisco County<br>Super. Ct. Nos. 216202, 218118) |

A jury convicted defendant Marco Mejia of one felony count of attempted robbery after he tried to steal a cell phone from the victim, R.L.[1]  On appeal, Mejia argues that his conviction must be overturned because (1) the trial court wrongly prevented R.L.'s testimony from being impeached with evidence of a prior confrontation R.L. had with police officers; (2) his trial counsel was ineffective by promising in the opening statement that Mejia would testify; and (3) the prosecutor committed misconduct by commenting in closing argument on Mejia's failure to testify.[2]  We reject these claims and affirm.

---

[1] Mejia was convicted under Penal Code sections 211 and 664.  All further statutory references are to the Penal Code unless otherwise noted.

[2] Mejia appealed from both the judgment in the attempted-robbery matter, case No. 218118, and an order revoking his probation in an unrelated matter, case No. 216202. He does not, however, raise any claims involving the revocation of his probation.

1

# I.
## FACTUAL AND PROCEDURAL
### BACKGROUND

Early on the morning of December 21, 2011, R.L. was walking home in the Mission District of San Francisco after having two beers at a bar nearby. As she arrived at the house where she was staying, she noticed a "Latin" male with a shaved head and wearing a black hooded sweatshirt walking toward her, "hugging the wall" of the house. He approached her and demanded her cell phone, but she refused to give it to him. He then pulled out a black handgun and held it against her head while threatening to kill her. Based on her experience shooting handguns, she believed the gun "was fake" because it felt too light when pressed against her temple. The man shoved R.L. into the wall, at which point she "panicked and . . . started screaming."

The man ran across the street, and R.L. testified he then entered the passenger's side of a "black SUV" illegally parked in some neighbors' driveway. She ran into the street to try to get its license-plate number, and the SUV "was put into reverse at a speed that [one] would not drive to casually back out of a space." Believing the driver intended to hit her, R.L. jumped out of the way. Before the SUV left the scene, she was able to observe "a huge sports sticker decal" on the back of it and some of its license plate's letters and numbers.

Within minutes, R.L. "flagged down" San Francisco Police Officer Glen Wilson and his partner as they drove by in their patrol car. She reported that a man had tried to steal her cell phone at gunpoint. Based on her description of the man and the SUV, Officer Wilson informed dispatch that the suspect was a Latin male wearing a black hooded sweatshirt and that the vehicle was a black SUV with a license-plate number beginning in "5XH" and ending in "7" or "97."

San Francisco Police Officer Angus Chambers and his partner were patrolling in the area when they heard a broadcast about the suspect and SUV. They soon spotted a black SUV with a Raiders sticker on the back and the license-plate number "5XJH657," which was being driven by a man matching the suspect's description. They followed the

2

SUV, but it pulled into a gas station before they could initiate a stop. They then parked behind it and ordered the driver, Mejia, out of the vehicle and handcuffed him. He had a shaved head and was wearing a black hooded sweatshirt. A search of the SUV revealed a black "replica firearm" inside the center console.

Officer Wilson and his partner transported R.L. to the gas station where Mejia was detained. After they arrived at the station, R.L. saw Mejia and "blurted out that that was the person [who] had attempted to rob her, that's the guy." She also positively identified the SUV and the firearm found inside it.

At trial, the defense presented testimony from three witnesses: a psychologist who testified about problems with eyewitness identification, an investigator for the public defender who testified about statements R.L. made in an interview, and a police inspector who testified about various aspects of the investigation. Mejia did not testify.

The jury found Mejia guilty of attempted robbery. The trial court revoked his probation in the unrelated matter based on the evidence presented at trial. It sentenced him to three years in prison for his conviction of assault with a deadly weapon in the other matter and a concurrent term of three years in prison for the attempted robbery.[3] As Mejia already had over three years of custody credits, he received a "paper commitment" and was immediately placed on parole. (See § 1170, subd. (a)(3).)

## II.
### DISCUSSION

#### A. *The Trial Court Properly Exercised Its Discretion in Excluding Evidence of Prior Conduct Offered to Impeach R.L.'s Testimony.*

Mejia argues that the trial court violated his constitutional rights by refusing to permit him to impeach R.L.'s testimony with evidence of a confrontation R.L. had with police officers during a celebration of the San Francisco Giants' World Series victory in 2012. We disagree.

---

[3] The assault conviction was under section 245, subdivision (a)(1).

1.    Additional facts.

Before trial, the prosecution filed a motion to exclude evidence of a confrontation between R.L. and police officers for which she was arrested. As described in the motion, R.L. was "celebrat[ing] the [Giants'] victory with hundreds of other fans on the streets of the Mission District. At approximately 11:00 p.m., numerous celebrants, including [R.L.], stopped to see a large fire that had been set inside a dumpster on Mission Street between 23rd and 24th Streets. Police officers in protective gear and face shields attempted to disperse the crowd, which upset the celebrants. [R.L.] yelled a few profanities at officers . . . and spit in their general direction. Officers later noted that [R.L.] was 'shocked' when she saw her spittle actually land on an officer. [R.L.] was subsequently arrested for . . . two misdemeanor charges: . . . public intoxication . . . and . . . battery on [a] peace officer[,] . . . [¶] . . . and she was sent to Pre-Trial Diversion," where "to date [she] is making positive progress toward completing her . . . program." The prosecution argued that evidence of R.L.'s prior conduct was not admissible to impeach her testimony because it did not involve moral turpitude and any probative value it had was outweighed by the risk of undue prejudice under Evidence Code section 352 (section 352).

At a hearing the next day, the parties and the trial court discussed the motion at length. The court tentatively ruled it would exclude the evidence, stating:

> Look, the conduct itself, . . . I'm not really clear that this even falls within moral turpitude. But even if for the sake of argument you say somehow it does, when I start to do a [section] 352 analysis and I think of the consumption of time that's going to be involved and the statement of facts, you know, they could bring in a police officer who would explain, "Why did you feel she looked so startled when . . . she spit on your mask?"

> And we get into all of this conjecture, and this is readymade to confuse the issues, lengthen the trial. It's so tangentially related at this stage of the game to what the issues are.

> Then when I consider, you know, [R.L.] has a Fifth Amendment right not to talk about it at all because she has pending charges, I . . . under [section] 352 would just say that I wouldn't admit it.

4

In response, Mejia filed a "supplemental motion[] in limine" providing additional details about R.L.'s conduct:

> [F]ollowing the . . . win, [R.L.] chanted at the police, "[F]uck the police, you can't stop us!" while the police attempted to control growing crowds in order to allow fire trucks to extinguish a dumpster fire started by another member of the crowd. The police report stated [R.L.] was "unsteady on her feet," her "eyes were red and watery," and the "odor of an alcoholic beverage" was detected on her breath. [R.L.] simulated a pelvic thrust motion at a police officer and shouted, "I'll fuck you, you faggot ass mother fucker!" When the officer failed to react to [R.L.'s] conduct, [R.L.] began spitting at the officer—first at the ground in front of the officer, then at the officer's pants, and finally on the officer's face shield. [R.L.] attempted to flee, but [she] was detained by the officers.

Mejia argued that R.L.'s conduct left her "facing charges of battery on a police officer[,] a crime of moral turpitude," and "serve[d] to further discredit [her] testimony because it [called] into question her motive for cooperating with the police in this case."

The trial court revisited the issue at another hearing. It indicated it would assume, "for the sake of argument," that R.L. had been charged with a crime involving moral turpitude. It heard further argument from the parties and ruled as follows:

> When I do another [section] 352 analysis[,] I'm still [coming to] the same conclusion: that we're not going to have a mini[-]trial on something like this where it's going to confuse the issues, . . . consume an enormous amount of time, and I don't know how likely this is in terms of relevance, how likely this is to [impugn R.L.'s] credibility. There's no kind of connection there.
>
> . . . .
>
> . . . I've reconsidered everything from yesterday, today, I've redone the [section] 352 analysis, and now I'm even more convinced it's more prejudicial than probative. . . . [W]hat[ever] marginal relevance it might have is overwhelmed by the fact that it's just going to suggest [R.L.] is a bad person, maybe she deserved to get robbed. That's a definition of more prejudicial than probative. So I stand by my earlier ruling.

5

## 2.    The trial court properly exercised its discretion in excluding the evidence of the World Series incident.

Mejia claims the trial court's ruling under section 352 excluding the evidence of R.L.'s prior conduct violated state law and his constitutional rights to present a defense and to cross-examination. We disagree because we conclude the trial court did not abuse its discretion.

Although the testimony of witnesses in criminal cases is subject to impeachment with evidence of moral turpitude, such evidence may be excluded when its " 'probative value is substantially outweighed by its potential for prejudice, confusion, or undue consumption of time' " under section 352, which " 'empowers courts to prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues . . . . [¶] . . . Moreover, impeachment evidence other than felony convictions entails problems of proof, unfair surprise, and moral turpitude evaluation which felony convictions do not present. Hence, courts may and should consider with particular care whether the admission of such evidence might involve undue time, confusion, or prejudice which outweighs its probative value.' " (*People v. Sapp* (2003) 31 Cal.4th 240, 289-290.)

We review the trial court's ruling under section 352 for an abuse of discretion. (*People v. Ardoin* (2011) 196 Cal.App.4th 102, 121.) " 'To constitute an abuse of discretion, "the resulting injury [must be] sufficiently grave to manifest a miscarriage of justice. [Citation.] In other words, . . . the court [must] exceed[] the bounds of reason, all of the circumstances being considered." ' " (*Ibid.*)

We agree with the basic premise that the fact a prosecution witness is facing criminal charges may be relevant to the issue of that witness's bias. (See *People v. Dyer* (1988) 45 Cal.3d 26, 49-50.) But although Mejia argues this point at length, his only explanation for why the trial court abused its discretion under section 352—which permits the exclusion of evidence even if it is otherwise relevant and admissible for impeachment purposes—is the conclusory statement that the court had "[a]n erroneous understanding . . . of its discretionary power." It appears Mejia is referring to his

6

contention that the court improperly focused on the Fifth Amendment issue involved in R.L.'s testimony about the underlying conduct instead of on the bias revealed by "[t]he fact of the arrest itself . . . [and] the fact that [R.L.] was still subject to prosecution."

We disagree that the trial court misunderstood its discretion under section 352. To the contrary, the record reveals the court carefully engaged in the weighing process required by that statute. The court was not required to mention every basis on which the proffered evidence might be relevant in performing its analysis, so the fact it never explicitly referred to R.L.'s potential bias is of little significance. (See *People v. Holt* (1983) 37 Cal.3d 436, 453 [no requirement that "the trial court engage in an on-the-record evaluation of the factors affecting the weighing process" under section 352].) Moreover, Mejia sought to present evidence of R.L.'s *conduct*, not just the fact that criminal charges were pending against her. Even if evidence of a more limited scope might have been more likely to pass muster under section 352, the court cannot be faulted for not considering that possibility when Mejia never suggested it. Because the court did not abuse its discretion in excluding the evidence under section 352, its ruling did not violate Mejia's right to present a defense or to cross-examine the witnesses against him. (See *People v. Linton* (2013) 56 Cal.4th 1146, 1202.)

### B. *Mejia Fails to Establish He Received Ineffective Assistance of Counsel Based on the Defense's Opening Statement.*

Mejia claims he received ineffective assistance because his trial counsel essentially promised in the defense's opening statement that Mejia would testify but never called him as a witness. We are not persuaded.

#### 1. Additional facts.

In her opening statement, Mejia's trial counsel addressed the jury as follows:

> The facts of this case, ladies and gentlemen, are going to show you that Mr. Mejia did not rob or attempt to rob [R.L.]. He was not the robber. Mr. Mejia was driving his vehicle, and unfortunately he was at the wrong place at the wrong time.
>
> Mr. Mejia is a young man who is a worker and he had been working all that day, and this was an unfortunate circumstance because what had happened is he was working, he went to a bar to have a drink, he agreed to

7

give a man a ride home, and when he did that, it backfired because he had no idea what this man was going to do.

　　　　And when he did find out what this man had tried to do, he immediately kicked him out of his car. He then proceeded to go home and stopped at the gas station to get gas before going home, and that's what he did.

　　　　And the description, Latin male wearing a black hoodie in an SUV, is the description of the person who robbed [R.L.].

. . . .

　　　　Ladies and gentlemen, at the end of this case I'm going to ask you to review all the facts, and I'm going to ask you to come back and find Mr. Mejia not guilty of the crime charged because Mr. Mejia did not try to rob [R.L.]. He is not a thief, he is not a robber.

　　　　He gave a guy a ride home, and he had no idea what was going to happen. And the moment he did, he acted accordingly because he wanted no part of that. He doesn't want anything to do with that.

As mentioned above, Mejia did not testify, and there was no other evidence presented to support most aspects of the above factual scenario. As discussed in more detail in section II.C. below, Mejia's trial counsel nevertheless referred to this scenario again in her closing argument, and the prosecutor responded by emphasizing the lack of evidence to support it.

　　　　　　2.　　　　Mejia's claim of ineffective assistance of counsel lacks merit.

The federal and state Constitutions guarantee criminal defendants the right to adequate representation by counsel. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15; *People v. Mai* (2013) 57 Cal.4th 986, 1009.) To prevail on a claim of ineffective assistance of counsel, a defendant must show both that "counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing norms" and that there was "resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different." (*Mai*, at p. 1009.)

In considering such a claim, "a reviewing court defers to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of

reasonable professional assistance." (*People v. Mai*, *supra*, 57 Cal.4th at p. 1009.) Because the presumption of counsel's competence can typically be rebutted only with evidence outside the record, ineffective-assistance claims are normally raised in habeas corpus proceedings where such evidence can be presented. (See *ibid.*) A reversal on direct appeal is warranted only if "(1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation." (*Ibid.*)

"Whether the failure to produce a promised witness amounts to ineffective assistance of counsel is a fact-based determination that must be assessed on a case-by-case basis. [Citation.] Forgoing the presentation of testimony or evidence promised in an opening statement can be a reasonable tactical decision, depending on the circumstances of the case." (*People v. Stanley* (2006) 39 Cal.4th 913, 955.) As a result, "[m]aking promises about the defense evidence in opening statement and then failing to deliver does not constitute ineffective assistance per se." (*People v. Burnett* (2003) 110 Cal.App.4th 868, 885.)

Mejia argues his trial counsel rendered ineffective assistance by delivering an opening statement in which "she represented facts that only [he] could reasonably testify to" but then "fail[ing] to call [him] to the stand." He contends the "huge discrepancy" between the opening statement's version of events and the evidence produced at trial "cannot reasonably be deemed a change in strategy."

Even assuming the defense's opening statement effectively promised the jury that Mejia would testify, he fails to address an obvious potential explanation for his trial counsel's failure to call him as a witness: that after she gave the opening statement, he decided not to testify. As the Attorney General points out, "[a]lthough tactical decisions at trial are generally counsel's responsibility, the decision whether to testify, a question of fundamental importance, is made by *the defendant* after consultation with counsel." (*People v. Carter* (2005) 36 Cal.4th 1114, 1198, italics added.) On this record, it is possible Mejia's counsel believed when she gave the opening statement that Mejia would

9

testify, but Mejia subsequently changed his mind, which he had a right to do whether or not his counsel agreed with the decision.[4] If this occurred, then his counsel did not render ineffective assistance by signaling in the opening statement that he would testify.

The possibility that Mejia's trial counsel had no reason to anticipate Mejia's not testifying distinguishes this case from the two decisions Mejia cites that involve promises in opening statements that the defendant would testify. Both decisions involved defense counsel's affirmative discouragement of the defendant from testifying even though no unforeseen events occurred after the opening statement that would have justified the reversal in strategy. (*United States ex rel. Hampton v. Leibach* (7th Cir. 2003) 347 F.3d 219, 258 [after promising defendant would testify, defense counsel advised defendant not to testify based on concern that "would have been obvious from the outset of the case"]; *Ouber v. Guarino* (1st Cir. 2002) 293 F.3d 19, 27-29 [no surprises during trial "justified a retreat from [the] promise previously made"]; cf. *People v. Frye* (1998) 18 Cal.4th 894, 983-984 [no ineffective assistance where defense counsel advised defendant not to testify after defendant's "difficulty remembering information" became apparent during trial].) Here, Mejia's claim of ineffective assistance of counsel necessarily fails because it is possible that any promised testimony was not presented because of circumstances outside of counsel's control.

---

[4] We note that late in the trial, Mejia's counsel suggested she had advised him not to testify. After the trial court ruled that a pinpoint instruction related to aiding and abetting would be given over Mejia's objection, his counsel stated she "obviously would have advised Mr. Mejia differently with respect to testifying" had she known the jury would be instructed that it could convict even if its members did not unanimously agree on whether Mejia was the principal or an accomplice. The court then indicated that it would "seriously consider allowing [her] to reopen" to present Mejia's testimony, but she never sought to do so. Mejia does not attempt to make anything of this exchange, however, and we conclude it is too vague to establish that his counsel necessarily advised him *after* the opening statement not to testify or that he would have testified but for any such advice.

C. *Even if Mejia Had Preserved His Claim of Prosecutorial Misconduct, the Prosecutor Did Not Improperly Comment on Mejia's Silence.*

Finally, Mejia claims the prosecutor's rebuttal to the defense's closing argument "constitute[d] impermissible commentary [on his] exercise of his Fifth Amendment right not to testify." We conclude both that Mejia forfeited this claim and that there was no prosecutorial misconduct in any case.[5]

1. Additional facts.

After the close of evidence, the prosecutor requested that Mejia's trial counsel not be permitted to "retell [the] story" from her opening statement because no evidence supporting it had been presented, stating, "I think it would be disingenuous and unethical at this point, knowing what the evidence is, to say, 'My client was working that day. He went to a bar. He met a stranger,' because there's no evidence of that." The trial court denied the request but cautioned both attorneys to "be very careful if you get into [that] subject matter that you are not by implication asking the jury to consider the fact [Mejia] hasn't testified."

During his closing argument, the prosecutor did not initially mention the scenario the defense had advanced in its opening statement. In her closing argument, however, Mejia's trial counsel repeatedly claimed that Mejia had forced the real perpetrator out of the SUV once he realized what had happened. For example, when addressing the small amount of time between when Officer Wilson and his partner made contact with R.L. and when Officer Chambers and his partner began following the SUV, she said, "[W]ell, two minutes is a sufficient amount of time to kick somebody out of your vehicle once you learn what they've done. When they get in the car and say, 'Go, go, go,' and you take off, and then you realize what the heck this person did and you kick them out of a car because you don't want to have anything to do with it, this timing is important. [¶] Because if you were part of this plan or if you were part of what this attempted robber

---

[5] In light of our determination that the prosecutor did not commit misconduct, we need not reach the claim that Mejia's trial counsel rendered ineffective assistance by not objecting to the prosecutor's statements.

11

was doing, you wouldn't get him out of the car around the block, you wouldn't kick him out." Later on, she said, "[T]he circumstantial evidence indicates . . . that once [Mejia] found out [what the real perpetrator had done], he made this person leave, get out of his car, and then he proceeded home." Finally, she concluded by arguing that Mejia did not have the requisite intent because "when he found out what this person had done to [R.L.], he took actions to make sure that he was not associated with it."

In rebuttal, the prosecutor then addressed the defense's scenario at length:

> Essentially, there is this mystery man [who] dresses exactly like the defendant and looks exactly like he does. There is this mystery man. Who he is, I'm not sure, okay? But there is a mystery man [who] looks like him, dresses like him, has his height, has a shaved head who[m] he kicked out of the car.

> If someone is this mystery man [whom] I supposedly met in a bar who looks exactly like me, who's a stranger to me, and I decide to drive him Lord knows where, and he pulls a stunt like this on the side of the street where I'm seeing what's happening, do you know what I'm not going to do? I'm not going to say, "Okay, get out of my car. I think I'm going to fill up my tank now. That seems like a good idea."

> This guy just terrified a loud, screaming lady. . . . [Mejia]'s sitting here and it's happening on his left side, and the story is supposedly, "I made him get out, and then I was like, 'I'm going to [head] up to Chevron and fill up my tank, call it a night.' "

> That is absolutely ridiculous, and there has been no evidence presented at all about that, none.

> And this is straight from the jury instructions: "What the attorneys say is not evidence. Evidence is the sworn testimony of witnesses, exhibits admitted into evidence," so on and so forth. "Nothing that the attorneys say is evidence."

> So when [Mejia's trial counsel] said in her opening argument [that Mejia] met this doppelganger twin [who] looked exactly like him at the bar, [who] dresses like him with a shaved head, this stranger [whom] he wanted to give a ride to, there's no evidence of that, zero, zilch, nothing, nothing.

> So the law says what the attorneys say is not evidence. All I'm asking you to do is follow the law, and any ridiculous story that [Mejia's trial counsel] gave and presented zero evidence about is not evidence.

Mejia did not object to any of the prosecutor's statements.

12

2.     Mejia did not properly preserve the claim, but even if he had the prosecutor's statements did not amount to improper commentary on Mejia's failure to testify.

"A prosecutor's conduct violates the federal Constitution when it infects the trial with such unfairness as to make the resulting conviction a denial of due process.  Conduct by a prosecutor that does not rise to this level nevertheless violates California law if it involves the use of deceptive or reprehensible methods to attempt to persuade either the [trial] court or the jury.  [Citations.]  To preserve a prosecutorial misconduct claim for appeal, [a] defendant ' "must make a timely and specific objection and ask the trial court to admonish the jury to disregard the impropriety" ' unless doing so would be futile or an admonition would not cure the harm."  (*People v. Whalen* (2013) 56 Cal.4th 1, 52.)

Mejia concedes he did not object to the challenged statements, and he does not argue that seeking an admonition would have been futile.  Instead, he offers two reasons that we should nevertheless excuse his failure to object.  First, he urges us to exercise our discretion to consider forfeited claims.  Second, he argues that we should "review the issue to forestall [his] claim of ineffective assistance of counsel."  We conclude that Mejia forfeited his claim and that the claim would fail on the merits even if it had not been forfeited.

Mejia contends that the prosecutor's statements in rebuttal amounted to improper commentary on his silence because he was "the only person who could feasibly testify to the facts cited by the prosecutor."  In *Griffin v. California* (1965) 380 U.S. 609, the United States Supreme Court held that the federal Constitution "forbids . . . comment by the prosecution on the accused's silence."  (*Id.* at p. 615.)  "Pursuant to *Griffin*, it is error for a prosecutor to state that certain evidence is uncontradicted or unrefuted when that evidence could not be contradicted or refuted by anyone other than the defendant testifying on his or her behalf."  (*People v. Hughes* (2002) 27 Cal.4th 287, 371.)  *Griffin* does not, however, prohibit " ' "comments on the state of the evidence or on the failure of the defense to introduce material evidence or call logical witnesses." ' "  (*Hughes*, at p. 372.)

13

Although Mejia asserts there was misconduct under the *Hughes* rule, he does not explain how any of the prosecutor's rebuttal comments amounted to a claim that certain evidence was "uncontradicted or unrefuted." (*People v. Hughes*, *supra*, 27 Cal.4th at p. 371.) Moreover, he acknowledges that "the unidentified mystery man" could have theoretically testified to these events as well. As a result, we view the challenged statements not as "an assertion that the prosecution's evidence was not contradicted by defendant personally" in violation of *Hughes* but as a proper commentary on the state of the evidence and the holes in the defense case. (*Id.* at p. 373.) There was no prosecutorial misconduct.

### III.
#### DISPOSITION

The judgment is affirmed.

_____
Humes, P.J.

We concur:

_____
Margulies, J.

_____
Dondero, J.