Filed 11/9/20  P. v. Rush CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H045678 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C1764145) |
| v. | |
| PERRY J. RUSH, | |
| Defendant and Appellant. | |

Following a trial, a jury found defendant Perry J. Rush guilty of assault with a deadly weapon other than a firearm (Pen. Code, § 245, subd. (a)(1))[1] (245(a)(1)) (count 1) and battery with infliction of serious bodily injury (§ 243, subd. (d)) (243(d)) (count 2).  As to each count, the jury found true the allegation that in the commission of the crime, defendant personally inflicted great bodily injury upon the victim, D.M., within the meaning of sections 12022.7, subdivision (a) (12022.7(a)) and 1203, subdivision (e)(3).

On appeal, defendant argues that (1) his trial counsel rendered ineffective assistance of counsel by telling the jury in his opening statement that defendant would testify at trial but then, without the occurrence of any unforeseeable events, not presenting defendant's testimony; (2) the trial court violated section 654 by imposing a sentence on count 2 and not staying the punishment; and (3) the enhancement imposed under section 12022.7(a) must be stricken because such enhancement does not apply

---

[1] All further statutory references are to the Penal Code.

where "infliction of great bodily injury is an element of the offense" (§ 12022.7, subd. (g)) and "great bodily injury" is an element of battery with infliction of serious bodily injury (§ 243(d)).

Defendant has not established his claim of ineffective assistance of counsel. In addition, although the People concede sentencing error, the record does not actually reflect that the trial court orally pronounced sentence on any count of which defendant was found guilty and the associated enhancement allegations found true by the jury. Accordingly, we reverse with directions for the trial court to clarify whether it intended to pronounce sentence and suspend execution of sentence and if that was the court's intent, to properly orally pronounce sentence.

I

*Procedural History*

By information, defendant was charged with committing two counts of felony assault upon D.M. on May 21, 2017: assault with a deadly weapon and instrument other than a firearm, namely a hammer and a "pool cue stick" (count 1) (§ 245(a)(1)) and assault by means of force likely to produce great bodily injury (count 2) (§ 245, subd. (a)(4)). The information further alleged as to each count that in the commission or attempted commission of the offense, defendant personally inflicted great bodily injury upon D.M., a person not an accomplice to the offense, within the meaning of sections 12022.7(a), and 1203, subdivision (e)(3).

A first amended complaint was filed on November 21, 2017. The reference to a hammer in count 1 was omitted, so that defendant was charged with committing felony "assault . . . with a deadly weapon and instrument other than a firearm, a pool stick" (§ 245(a)(1)). Count 2 was amended to charge felony battery with infliction of serious bodily injury (§§ 242, 243(d)). An allegation of personal infliction of great bodily injury was attached to each count (see §§ 12022.7(a), 1203, subd. (e)(3)).

2

Following a trial, the jury found defendant guilty of both counts, and it found the associated enhancement allegations to be true. Under section 245(a)(1), "[a]ny person who commits an assault upon the person of another with a deadly weapon or instrument other than a firearm shall be punished by imprisonment in the state prison for two, three, or four years, or in a county jail for not exceeding one year, or by a fine not exceeding ten thousand dollars ($10,000), or by both the fine and imprisonment." Under section 243(d), "[w]hen a battery is committed against any person and serious bodily injury is inflicted on the person, the battery is punishable by imprisonment in a county jail not exceeding one year or imprisonment pursuant to subdivision (h) of [s]ection 1170 for two, three, or four years." Section 12022.7(a), provides: "Any person who *personally* inflicts great bodily injury on any person other than an accomplice in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for three years." (Italics added.)

The probation report prepared for sentencing confusingly recommended that the court commit defendant to the California Department of Corrections and Rehabilitation for eight years and suspend execution of the sentence and that the court suspend *imposition* of sentence and place defendant on formal probation for three years. The report suggested a six-year term for count 1 and its associated enhancement, consisting of a middle term of three years (§ 245(a)(1)) and a consecutive three-year enhancement term (§ 12022.7(a)). The report also suggested that the court impose a consecutive two-year term on count 2 and its associated enhancement, but it did not *separately* specify a recommended term for count 2 or its enhancement. The report further stated: "This officer recommends the midterm sentence of three years state prison as to [c]ount one, with the enhancement of three (3) years for personally inflict[ing] great bodily injury to be imposed. . . . [C]onsecutive sentencing is further recommended as to [c]ount [t]wo, along with the enhancement for personally inflict[ing] great bodily injury to be imposed, for a total of eight (8) years." The report did not discuss section 654.

3

At the sentencing hearing on January 19, 2019, the trial court indicated that "the suspension of the state prison sentence accomplishes more of what the Court wishes to accomplish here, which is that Mr. Rush needs to get on top of the anger issues that led to this incident." The court stated that it was going to impose the midterm because the victim's injuries were serious, but it did not specify the count or conviction. The court stated: "The defendant is committed to the California Department of Corrections and Rehabilitation for a period of eight years. The execution of said sentence is suspended. Imposition of sentence [is] suspended, formal probation is granted for a period of three years." It further stated with regard to probation: "A county jail sentence is imposed as follows: As to Count 1, the defendant will serve one year in the county jail; as to Count 2 the defendant will serve . . . one year in the county jail, those counts will run consecutive to one another."

At the January 19, 2018 sentencing hearing, the court did not separately impose terms of imprisonment on each count and its associated enhancement or expressly state whether any sentence ran concurrently or consecutively. Neither did the court mention section 654's proscription against multiple punishment.

II

*Evidence*

Number One Broadway was a bar on the top floor of a two-story building on the corner of South Santa Cruz Avenue and Broadway in Los Gatos. Its front entrance was located off South Santa Cruz Avenue. An exterior balcony, accessible by patrons of the bar, wrapped around the outside of the bar.

Number One Broadway had live music and dancing on weekends. The bar had a pool table near a rear exit, which opened onto the balcony. G.A. worked weekends as a bouncer at the bar, and he had a different weekday job. At the time of trial, G.A. had worked at Number One Broadway for close to 13 years. G.A. knew defendant as a regular at the bar.

4

On the evening of May 20, 2017, the bar was three-quarters full and people were dancing. G.A. recalled that defendant arrived shortly before 10:00 p.m. At some point, the bouncer's attention was drawn to defendant and another man, D.M. The men were staring at each other, and defendant appeared angry and was pointing. D.M. was shrugging his shoulders. People were moving away from them. The bouncer approached them and "asked, 'What's the problem?' " Defendant complained that D.M. had been bumping into him all night, and he wanted the bouncer to do something about it. At trial, the bouncer testified that it was common for people to bump into each other on the dance floor but that he had not personally seen D.M. bump into defendant.

On the night of the incident, the bouncer asked D.M. to give defendant some "distance," and D.M. backed off. Defendant went toward the pool table and stood there. The bouncer told defendant to "just leave it alone." But defendant "continued to wave at [D.M.] with his hands saying, come over here." The bouncer discouraged D.M. from walking across the room to defendant. Sometime later, the bouncer noticed D.M. walking across the dance floor toward defendant, and the bouncer followed. Defendant and D.M. headed to the rear exit. Defendant walked out first, and D.M. followed.

Watching out a window, the bouncer saw the two men on the balcony; defendant had a pool stick in his hand. He could not hear what was being said, if anything. The bouncer witnessed defendant turn and raise the pool stick. As the stick was being raised, D.M. began to back up and raise his arm to block it. Defendant struck D.M. on the left forearm with the center of the stick. At trial, the bouncer testified that based on "the arc" of the pool stick, it appeared that the stick would have struck the center of D.M.'s head if he had not blocked it.

The bouncer, who was out on the balcony by this point, took the pool stick from defendant. The stick belonged to the bar, and the bouncer believed it was made of oak wood or some other hardwood. The bouncer testified that defendant had seemed upset and that D.M. had looked confused. Although at the time it did not appear to the bouncer

5

that D.M. needed immediate medical attention, D.M. was holding his arm. At trial, the bouncer testified that defendant had been "the aggressor."

The bouncer told both men to leave, and he had them go out by different doors. Defendant went out the rear, and D.M. left through the front.

Later that night, the bouncer discussed the incident with police. At a subsequent time, he spoke with Detective James Wiens.

At trial, D.M. testified that on May 20, 2017, he arrived at Number One Broadway at 9:30 p.m. While D.M. was dancing, another man on the dance floor, identified at trial as defendant, complained that D.M. had bumped into him. D.M. testified that he apologized and said that he was "just there to have a good time." Defendant was "still angry" and argumentative, and he complained about D.M. bumping into him. This initial encounter ended when the bouncer intervened. At trial, D.M. admitted that on the dance floor, he had bumped into defendant once or twice and that he had probably bumped into others.

D.M. acknowledged that later that night, he had gone out through the bar's rear door near the pool table. D.M. indicated that defendant had not gestured for him, or otherwise encouraged him, to come out onto the balcony. D.M. denied that when he went out onto the balcony, he was mad at defendant or trying to fight defendant.

D.M. testified that when he went outside, defendant immediately "swung a pool stick" at his head, and he raised his arm to block it. According to D.M., the stick struck his forearm and the side of his neck, but most of the force landed on his arm. D.M. described the resulting arm pain as "very painful" and a "10" on a pain scale of one to 10, with 10 being the worst pain he had felt in his whole life. The bouncer told them both to leave, and he sent them out by separate doors.

D.M. testified that he complied, and after leaving the bar through the front door, he walked down Santa Cruz Avenue toward his car. D.M. recalled hearing someone talking, but testified that he did not hear the words said or see anyone. According to

D.M., when he turned his head, he saw defendant approximately 50 feet away, standing in front of his pickup truck. Its door was open. As D.M. walked over to defendant's truck, defendant was looking directly at D.M. At trial, D.M. testified that the truck had been parked on the corner where Number One Broadway was located, beneath the bar's balcony, toward the back of the building. According to D.M., at that time he approached defendant, he believed that defendant was going to apologize to him.

But in fact defendant was still angry about D.M. bumping into him, and defendant began arguing with D.M. They began to scuffle and grab each other in front of defendant's pickup truck. According to D.M., they accidently fell "halfway" into the truck. But D.M. conceded that it had been his "force" that had caused them to fall. Defendant had fallen backward into the truck, and D.M. had fallen partially on top of defendant.

At trial, D.M. initially testified that after they fell into the truck, defendant hit him with his fist, and then D.M. hit defendant back with his free right hand. But later, D.M. admitted that at the preliminary hearing he had been unable to recall who had hit whom first and that he still did not specifically recall defendant hitting him first. D.M. acknowledged that during this confrontation, he hit defendant three or four times in the face. Defendant repeatedly hit D.M.'s head with "a metal object that looked like a hammer." D.M. became scared and ran across the street to a park. At trial, D.M. maintained that there was no possibility that his left arm had been injured by the hammer rather than the pool stick.

On cross-examination, D.M. admitted that on the night of the incident, he had had approximately four vodka sodas. He conceded that he had "some memory problems" concerning that night.

After the clash with defendant, D.M. called his former girlfriend—with whom he later reconciled—and asked her to pick him up. He did not call police and report an

7

assault. But he was not surprised when the police showed up since he was "bleeding severely" and he figured somebody would call the police.

At approximately 12:16 a.m. on May 21, 2017, Frank Bazzar, an officer with the Town of Los Gatos, was dispatched to a park, which was across the street from Number One Broadway. It was the officer's understanding that defendant's girlfriend had called the police.

When Officer Bazzar found D.M. wandering in the park, he activated his body camera. The officer had D.M., who appeared to be in pain, sit down. The officer noticed several lumps on D.M.'s head. D.M. was bleeding from several small cuts on his head, and the blood was dripping down his face and onto his shirt, arms, and pants. D.M. was "babying his left arm." Officer Bazzar took a statement from D.M. while he was being treated by paramedics, who also had been dispatched to the park. D.M. was taken to Valley Medical Center for further treatment.

Defendant was identified as a potential suspect by police. Officer Bazzar called defendant's phone number, and when someone answered, he identified himself as a police officer and said he wished to speak with defendant. There was silence, and then the call was disconnected. Officer Bazzar then called again, and the call went straight to voicemail.

Officer Bazzar testified that he located blood in the first parking stall in the alley behind Number One Broadway and followed the trail along the sidewalk on Broadway to the corner of Broadway and Santa Cruz and across the street. He noticed a pool of blood but then lost the trail. On his next shift, Officer Bazzar located D.M.'s car, which was parked on the "west curb line" of South Santa Cruz Avenue, pointing southbound towards Number One Broadway, near 20 South Santa Cruz Avenue. The car was parked roughly 125 feet to the north of Number One Broadway's entrance.

Detective Wiens, who was assigned to investigate the assault at Number One Broadway, went to Valley Medical Center, where he took a statement from D.M., who

8

was in a hospital bed and heavily medicated. D.M. indicated that he had been confronted by a man on the dance floor after he had bumped into the man, and they had been separated. D.M. told the officer that he had gone outside, where the man had hit him once with a pool stick, striking his arm and neck. D.M. told the officer that after that, the man and he were ejected from the bar. D.M. indicated that he then encountered the same man outside the bar, and a scuffle had ensued. The man had reportedly hit D.M. in the head multiple times with "a metal object similar to a hammer."

Detective Wiens had conducted a follow-up interview with the bouncer. The bouncer told the officer that he had "seen them arguing on the dance floor," and he had "split them up." D.M. had seemed dumbfounded by the situation; he had apologized and said, "[H]ey, you know, I'm just here to have a good time." The bouncer also told the officer that he had seen defendant standing at the pool table and gesturing for or taunting D.M. to come and fight. The bouncer had seen D.M. walking toward defendant and then the two of them go outside. He had then seen defendant strike D.M. with a pool stick. The bouncer had gone outside, taken the pool stick from defendant, and broken them up. The bouncer told Detective Wiens that defendant had been "the dominant aggressor."

Dr. Tiffany Chao, a general and trauma surgeon at Santa Clara Valley Medical Center, treated D.M. when she came into work on the morning of May 21, 2017. It was her understanding that D.M. had come in with scalp lacerations, a broken nose, and a broken arm and that he had been hit on the head with a hammer and on the arm with a pool stick. X-rays revealed a broken ulna, which is a forearm bone. It had been broken transversely. This type of fracture generally occurs "when someone's arm is over [his or her] head and . . . then [an] item comes across it." A CT scan showed a hematoma in his right scalp and a broken left nasal bone.

*Discussion*

A. *Alleged Ineffective Assistance of Counsel: Promise Made in Opening Statement*

1. *Background*

During his opening statement on November 28, 2017, defense counsel said in part, "[T]he evidence will show that [D.M.] was dishonest when he told the police that my client came around and hit him with a hammer. But, in fact, what he did, he walked all the way around. He punched my guy in the jaw. And he had to have surgery on that jaw. . . . Mr. Rush is gonna testify to this. Mr. Rush will testify. . . . And he'll tell you what happened. He'll tell you that he was punched violently in the jaw, knocked back into his vehicle, and pummeled -- pummeled by [D.M.]." Defense counsel asserted that "[t]his was a violent fight that was initiated by [D.M.]." Defense counsel indicated that defendant would state that "[h]e was in a bar where there was an unprovoked attack." Defense counsel told the jury, "[I]t will be clear to you that anything Mr. Rush did this night was self-defense," and "it will be clear to you based on those facts that there's only one verdict you'll be able to reach in this case, and that verdict will be not guilty."

After the prosecution called its final witness in its case-in-chief, and outside the jury's presence, the court discussed various matters with counsel and denied defense counsel's section 1118.1 motion. The trial court spoke with counsel and defendant about defendant's decision whether to testify.

The trial court reminded defendant that he had a constitutional right to testify and a separate constitutional right not to testify and to remain silent. On the record, the trial court reported that there had been an off-the-record conference on jury instructions. The trial court stated that defense counsel had informed the court that he would be requesting a self-defense instruction and that the court had indicated it was disinclined to grant such a request because it did not see any evidence to support such instruction. Defense counsel had said that he wanted to speak with defendant "specifically about that

in terms of [defendant's] analysis and decision to testify." When then questioned by the court on the record, defense counsel indicated that he had had an "adequate opportunity to discuss the self-defense issue, as well as any other potential issues with respect to [his] client's right to testify or not testify." Defense counsel said that he was deferring to defendant "in terms of how he feels about [testifying]." In response to the court's questions, defendant indicated that he had had an opportunity to think about exercising one of those constitutional rights and speak to his counsel and that his decision was "[n]ot to testify."

In the presence of the jury, the prosecution rested its case. The trial court asked defense counsel whether he had any evidence or witnesses that he wished to present. Defendant counsel stated, "Your Honor, in spite of my comments in opening argument, the Defense has decided to rely on the state of the evidence as it exists, and we will rest."

In closing argument, the prosecutor said among other things, "[T]here's a very good reason the judge told you at the very begin[ning], before we stood up for opening statements, that [what] the attorneys say is not evidence because we can get up and say anything we want." He said, "[The] trial itself is where the rubber meets the road and all of the evidence comes out." He pointed out that "the Defense ha[d] the same subpoena power as [he did.]"

Defense counsel responded in his closing argument. He said, "I'm not as good [as] I used to be. I'm getting to that age where I'm slipping." He acknowledged, "I made some mistakes. Some things got by me." He told the jury, "Like [the prosecutor is] saying, in opening argument you were misled. Hey, I should not have said my client was going to testify. What I should have said is, my client will testify if [the prosecutor] makes a case. Because I have an absolute right to rely on the state of the evidence, and I had to the fight the urge to go for a knockout and take the decision." Defense counsel also told jury, "But you can't blame what I say on my client. And nothing we say is evidence."

11

In closing argument, defense counsel also reminded the jury that the prosecution had the burden of proving defendant's guilt beyond a reasonable doubt, that the defense had no burden of proof, and that defendant was presumed innocent. Defense counsel emphatically faulted himself for promising that defendant would testify, and he stressed that defendant had "an absolute constitutional right not to testify." He suggested that the defense case "came in through the district attorney." He argued that the prosecutor "brought in the photos of my client injured through the officer [who testified]."

During rebuttal, the prosecutor stated, "I want to be clear when I talk about what defense counsel promised in opening. I'm talking about the things he said about the defendant's injuries. I am not . . . commenting on his failure to take the stand. That's completely his right. And I won't say a word about that. You shouldn't consider that one way or another."

2. *Governing Law*

The standard for evaluating a claim of ineffective assistance of counsel is well established. It requires a two-prong showing of deficient performance and resulting prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).) "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." (*Id.* at p. 700.)

As to deficient performance, a defendant "must show that counsel's representation fell below an objective standard of reasonableness" measured against "prevailing professional norms." (*Strickland, supra,* 466 U.S. at p. 688.) "Judicial scrutiny of counsel's performance must be highly deferential." (*Id.* at p. 689.)

"On direct appeal, a conviction will be reversed for ineffective assistance *only if* (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding. [Citations.]"

(*People v. Mai* (2013) 57 Cal.4th 986, 1009, italics added.)  Usually, "[a] claim of ineffective assistance [of counsel] . . . is more appropriately decided in a habeas corpus proceeding.  [Citations.]"  (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267.)

The prejudice prong requires a defendant to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  (*Strickland*, *supra*, 466 U.S. at p. 694.)  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  (*Ibid*.)  "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.'  [Citation.]  Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'  [Citation.]"  (*Harrington v. Richter* (2011) 562 U.S. 86, 104 (*Harrington*).)

3. *Analysis*

a. *Alleged Deficient Performance*

The appellate record in this case sheds little light on defense counsel's interactions with defendant outside the record, including counsel's advice to defendant about testifying at trial at any given time or defendant's own thinking on whether he should testify prior to ultimately telling the court that he had decided not to testify.  Defense counsel's opening statement must be evaluated deferentially, based on what he knew or reasonably should have known at the time.  (See *Strickland*, *supra*, 466 U.S. at pp. 688 ["defendant must show that counsel's representation fell below an objective standard of reasonableness"], 689 ["Judicial scrutiny of counsel's performance must be highly deferential."], 690 [counsel's acts or omissions must be considered "in light of all the circumstances"]; see *In re Thomas* (2006) 37 Cal.4th 1249, 1257 ["We consider counsel's performance from his perspective, analyzing counsel's decisions based on what he knew or should have known at the time.  [Citations.]"].)

"Counsel was entitled to formulate a strategy that was reasonable at the time . . . ."  (*Harrington*, *supra*, 562 U.S. at p. 107.)  "A fair assessment of attorney performance

13

requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." (*Strickland*, *supra*, 466 U.S. at p. 689.) "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." (*Ibid.*)

"The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant." (*Strickland*, *supra*, 466 U.S. at p. 691.) For example, "[a] defendant in a criminal case has the right to testify in his or her own behalf. [Citations.] The defendant may exercise the right to testify over the objection of, and contrary to the advice of, defense counsel. [Citations.]" (*People v. Bradford* (1997) 15 Cal.4th 1229, 1332; see *Harris v. New York* (1971) 401 U.S. 222, 225 ["Every criminal defendant is privileged to testify in his own defense, or to refuse to do so"].) A counsel's "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." (*Strickland*, *supra*, 466 U.S. at p. 690.)

In *People v. Frye* (1998) 18 Cal.4th 894 (*Frye*), disapproved on another point in *People v. Doolin* (2009) 45 Cal.4th 390, 421, the defendant argued that his counsel was "ineffective for failing to deliver on two promises made to the jury during the opening statement." (*Frye*, *supra*, at p. 983.) One of those promises was that "defendant would testify and wanted to take the witness stand to tell what he remembered." (*Ibid.*) The other promise was that a neurologist and a psychologist would testify that "defendant suffered neurological and psychiatric impairments affecting his ability to recapture memory and process words." (*Ibid.*)

On the record before it in *Frye*, the Supreme Court could not conclude that trial counsel had acted deficiently by ultimately "advising [the] defendant against taking the witness stand notwithstanding having told the jury in opening statement that defendant

14

would testify." (*Frye*, *supra*, 18 Cal.4th at p. 983.) The court found that "[i]n light of [the] defendant's initial desire and willingness to testify, counsel's statement was an appropriate exercise of his decisionmaking responsibilities at trial. (Cf. *People v. Hines* (1997) 15 Cal.4th 997, 1032 [counsel not ineffective for informing jury during opening statement defendant would testify, given defendant's indication to counsel of willingness to do so].)" (*Id*. at pp. 983-984.) The court determined that "counsel's [subsequent] advice against testifying also fell within the realm of tactical considerations" because "[a]s the trial progressed," "counsel observed [the] defendant's increasing inability to remember." (*Id*. at p. 984.)

In this case, defendant may have given an account to his counsel consistent with a claim of self-defense and expressed his willingness and desire to testify. The testimony adduced at trial and the trial court's stance on giving a self-defense instruction may have reasonably altered defense counsel's advice.

In *People v. Burnett* (2003) 110 Cal.App.4th 868 (*Burnett*), a case that came before this court, the defendant was convicted of felony animal cruelty. (*Id*. at p. 873.) After a "driver behind [the defendant] tapped his car with her bumper, [the defendant] snatched [the driver's] little white dog . . . out of her car and threw him onto a crowded roadway where he was run over by a minivan and killed." (*Id*. at p. 870.) On appeal, the defendant claimed, among other things, that "defense counsel was ineffective . . . for failing to call [the] defendant to testify after promising that he would in his opening statement." (*Id*. at p. 883.)

In *Burnett*, this court recognized that "[m]aking promises about the defense evidence in opening statement and then failing to deliver does not constitute ineffective assistance per se." (*Burnett*, *supra*, 110 Cal.App.4th at p. 885.) We described the circumstances in that case: "[The] [d]efendant apparently led defense counsel to believe that [a dog] bit him and his tooth snagged on [the] defendant's finger. When all of the witnesses testified that this did not happen, including the only defense witness . . . whom

15

defense counsel told the jury he expected to corroborate the testimony of defendant but who instead testified consistently with prosecution witnesses, defense counsel was compelled to change course." (*Id*. at p. 884.) We reasoned that it was "not defense counsel's fault that defendant lied to him" (*ibid*.) or that counsel "told the jury that he would present evidence which, apparently during the course of the trial, he discovered was a lie." (*Id*. at pp. 884-885.) We concluded that "[c]ounsel's advice 'was an appropriate exercise of his decisionmaking responsibilities at trial.' [Citation.]" (*Id*. at p. 885.)

As defendant notes, some federal courts have held that a defense counsel rendered ineffective assistance by promising evidence in an opening statement and then failing to deliver at trial. (See, e.g., *United States ex rel*. *Hampton v*. *Leibach* (7th Cir. 2003) 347 F.3d 219, 258; *Ouber v*. *Guarino* (1st Cir. 2002) 293 F.3d 19, 27.) But counsel does not invariably render ineffective assistance by making such a promise. Moreover, the results reached in other cases do not dictate the outcome here. We assess whether a counsel's conduct amounts to deficient performance on a case-by-case basis. (*People v*. *Stanley* (2006) 39 Cal.4th 913, 955 (*Stanley*).) Further, "[t]he question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices . . . . [Citation.]" (*Harrington*, *supra*, 562 U.S. at p. 105.)

Here, defendant claims that "reasonably competent counsel would not have promised his client's testimony and then failed to present it." Defendant acknowledges that " 'unexpected developments' during a trial may justify changes in [a counsel's] previously announced trial strategies." But defendant asserts that in this case defense counsel "should have realized the folly of committing to [defendant's testifying in] an opening statement" and "should have anticipated" that the prosecutor would emphasize any broken promise during closing argument. Defendant suggests that defense counsel's promise of his testimony and the subsequent failure to present such testimony were not

16

justified by some intervening "unforeseeable event." He maintains that there was "no plausible tactical explanation" for defense counsel giving "an opening statement promising to present [defendant's] version of the events before [counsel] had resolved . . . whether [defendant] was going to testify." We are not persuaded by this reasoning, which we find faulty.

In this case, some trial testimony turned out to be favorable to defendant. There was evidence that D.M. had bumped into defendant and that D.M. had been told by the bouncer to distance himself from defendant. Nevertheless, D.M. had followed defendant out onto the bar's balcony. D.M.'s own testimony had debunked the idea that after defendant and D.M. had been ejected from Number One Broadway, defendant had pursued and attacked D.M. with a hammer as D.M. walked to his car. Rather, D.M. admitted that it was he who had approached defendant, who had been merely standing in front of his truck. D.M. also acknowledged that after he approached defendant, a scuffle ensued. D.M. indicated at trial that his own force had caused them to fall into the truck and that he had ended up partially on top of defendant. D.M. ultimately conceded at trial that he was unsure who punched first. D.M. admitted that he had been drinking and that he had trouble remembering what happened the night of the incident. Officer Bazzar described the blood evidence as beginning in the first parking stall in the alley behind Number One Broadway. D.M.'s car was parked to the north of the bar on South Santa Cruz Avenue. On the other hand, the eyewitness testimony of the bar's bouncer seems to have likely eliminated any viable claim of self-defense to the pool stick incident.

The actual evidence adduced appears to have diminished the potential benefit of defendant taking the stand. (Cf. *Pray v. Farwell* (9th Cir. 2015) 620 Fed.Appx. 561, 562-564.) In addition, the trial court stated that it was disinclined to give a self-defense instruction. Those were intervening events that may have affected defense counsel's calculus concerning the potential value and downsides of defendant's possible testimony and defendant's willingness and desire to testify.

17

Defendant ultimately told the court that he had decided not to testify.  As the People suggest, it is conceivable that defense counsel had a valid tactical reason for initially indicating in his opening statement that defendant would testify and for later advising him against testifying, assuming that was in fact what occurred.  Although in closing argument defense counsel took the blame for indicating that defendant would testify, those remarks do not conclusively establish ineffective assistance of counsel.  Defense counsel also strongly suggested in closing argument that the prosecution had not proved its case, which it made it unnecessary to call defendant.  The court's instructions and defense counsel's closing argument made it clear to the jury that defendant had the absolute constitutional right not to testify.

A fatal flaw in defendant's analysis is that he has not demonstrated deficient performance on direct appeal by establishing that (1) the record affirmatively discloses that his counsel had no rational tactical reasons for telling the jury that defendant would testify at trial but then not presenting his testimony; (2) defense counsel was asked for an explanation of his conduct but gave no reason; or (3) under the circumstances of this case, there simply could have been no satisfactory explanation for counsel's conduct. "[C]ertain practical constraints make it more difficult to address ineffective assistance claims on direct appeal rather than in the context of a habeas corpus proceeding. [Citations.]  The record on appeal may not explain why counsel chose to act as he or she did.  Under those circumstances, a reviewing court has no basis on which to determine whether counsel had a legitimate reason for making a particular decision, or whether counsel's actions or failure to take certain actions were objectively unreasonable. [Citation.]" (*People v. Mickel* (2016) 2 Cal.5th 181, 198.)  "Rarely is ineffective assistance of counsel established on appeal since the record usually sheds no light on counsel's reasons for action or inaction. [Citation.]" (*People v. Woodruff* (2018) 5 Cal.5th 697, 736.)  This is not one of those rare instances where deficient performance is established by the record on appeal.

b. *Inadequate Showing of Prejudice*

Defendant argues that his counsel's deficient performance was prejudicial because "[w]hen [his] second version [of what happened] never materialized, the jury inevitably concluded that, in fact, there was no alternate version of the events that took place, and that [D.M.'s] version was essentially correct." "As with all applications of the *Strickland* test, the question whether a given defendant has made the requisite showing [of prejudice] will turn on the facts of a particular case. [Citation.]" (*Roe v. Flores-Ortega* (2000) 528 U.S. 470, 485.)

"In assessing prejudice under *Strickland,* the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. [Citations.] Instead, *Strickland* asks whether it is 'reasonably likely' the result would have been different. [Citation.] This does not require a showing that counsel's actions 'more likely than not altered the outcome,' but the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters 'only in the rarest case.' [Citation.] The likelihood of a different result must be substantial, not just conceivable. [Citation.]" (*Harrington*, *supra*, 562 U.S. 86, 111-112.)

In *Stanley*, the California Supreme Court stated: "Whether the failure to produce a promised witness amounts to ineffective assistance of counsel is a fact-based determination that must be assessed on a case-by-case basis. [Citation.] Forgoing the presentation of testimony or evidence promised in an opening statement can be a reasonable tactical decision, depending on the circumstances of the case. [Citations.]" (*Stanley*, *supra*, 39 Cal.4th at p. 955.) In *Stanley*, a jury convicted the defendant of first degree murder, attempted murder, and six robberies, and it found true a robbery-murder special circumstance and allegations of personal use of a deadly weapon (knife). (*Id*. at p. 919.) The defendant "fault[ed] his counsel for failing to follow through on a representation made in his opening statement to present the testimony of an Oakland

19

police officer regarding the robbery of another cab driver that allegedly was committed in [the] defendant's neighborhood, by someone matching his description, while he was in custody." (*Id*. at pp. 954-955.)

The Supreme Court concluded in *Stanley*: "On this record, even were we to conclude counsel's failure to present the witness and testimony described in his opening statement had no tactical justification and fell below the normal range of competency, we would find such error nonprejudicial. [Citation.] There is no reason to assume the jury necessarily concluded counsel was unable to produce the witness, or that the failure to produce the witness meant defendant was the only possible suspect in the robberies . . . , or that the jury indeed based its guilty verdicts on the failure of the defense to produce the witness, contrary to the instructions they were sworn to follow." (*Stanley*, *supra*, 39 Cal.4th at p. 955.) Similarly, in this case, defendant has not demonstrated that prejudice resulted from his defense counsel's opening statement.

At the beginning of the trial, the trial court gave the jury some initial instructions. The court told the jury, among other things, that "[y]our verdict must be based only on the evidence presented during trial in this court and the law as I provide it to you." It instructed in part: "A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt. . . . [¶] Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. . . . In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all of the evidence that was received throughout the entire trial. Unless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty." The court told the jury: "You must decide what the facts are in this case. You must use only the evidence presented in this courtroom. Evidence is the sworn testimony of witnesses, the exhibits admitted into evidence, an[d] anything else I tell you to consider as evidence." The court stated: "Nothing that the attorneys say is

20

evidence. In their opening statements and closing arguments the attorneys will discuss the case, but their remarks are not evidence."

The trial court's final jury instructions reiterated: "In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial. Unless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty. [¶] Evidence is the sworn testimony of witnesses, the exhibits admitted into evidence, and anything else I told you to consider as evidence. Nothing that the attorneys say is evidence. In their opening statements and closing arguments, the attorneys discussed the case, but their remarks are not evidence."

In addition, the trial court instructed: "A defendant has an absolute constitutional right not to testify. He or she may rely on the state of the evidence and argue that the People have failed to prove the charges beyond a reasonable doubt. Do not consider for any reason at all, the fact that the defendant did not testify. Do not discuss that fact during your deliberations or let it influence your decision in any way."

As indicated above, in closing argument, defense counsel admitted that he had made a blunder during his opening statement by indicating defendant would testify. However, defense counsel also reminded the jury that his statements were not evidence. Counsel stressed that defendant had "an absolute constitutional right not to testify." The prosecutor also told the jury that defendant had a right not to testify and that it should not consider the fact he did not testify "one way or another."

Under the circumstances, defendant has not demonstrated prejudice. The jury was repeatedly told that counsel's remarks were not evidence, defendant had a constitutional right not to testify, and the fact that defendant did not testify could not be considered by jury. There is nothing in the record to suggest that defense counsel's opening statement influenced the jury's evaluation of the credibility of any witnesses, including the bouncer who was an eyewitness to defendant striking D.M. with a pool stick. Defendant has not

21

shown that it is reasonably probable that, but for defense counsel's opening statement promise that defendant would testify, "the result of the proceeding would have been different." (*Strickland*, *supra*, 466 U.S. at p. 694.)

B. *Section 654's Proscription against Multiple Punishment*

Defendant argues that the trial court violated section 654 by imposing and not staying a sentence on count 2 because he was convicted of both counts 1 and 2 "for committing the same physical act of striking [D.M.] once with a pool stick and breaking his arm." Defendant explains that "[a]lthough there was evidence introduced during trial of a separate incident of violence, [which] involve[ed] a hammer [and] occurred after the pool stick incident, the prosecution opted not to prosecute this second act."[2] Defendant asserts that since he was not prosecuted for the subsequent incident of violence outside the bar, the sentence imposed on count 2 must be stayed.

---

[2] The record reflects that in closing argument, the prosecutor asserted that defendant was guilty of the charged offenses because defendant struck D.M.'s arm with a pool stick, which broke his arm. The prosecutor described whatever happened subsequently, outside the bar, as a "mutual fight." He referred to a "second encounter" in which "defendant was hitting the victim over the head with a hammer or some type of metal object." The prosecutor told the jury, "We've made this easier for you. You don't have to decide what happened out there. . . . And you don't have to make any decisions about what happened outside. . . . This case is about the defendant hitting the victim with the pool stick." In closing argument, defense counsel told the jury: "[I]t's much more likely that the hammer broke [D.M.'s] arm than the pool stick. And [defendant's] not charged with that because of the brilliant strategy of the district attorney." "The injuries in the photo [of D.M.] are completely unrelated to the charge because the fight is not charged." He argued: "If the charge was assault with a pool stick and not a hammer, you can't convict. You don't have the pool stick. You don't know the pool stick injured him. . . . Reasonable doubt, folks. Clear-cut, unquestionable, reasonable doubt. Why is there no charge based on the hammer? Why is there no charge based on these photos?" In rebuttal, the prosecutor repeated that during the fight that followed the pool stick incident, defendant repeatedly hit D.M. in the head with a hammer. The prosecutor said that unlike the pool stick incident, there was no independent witness to the hammer incident. He indicated that the jurors "shouldn't think about" why defendant was not charged for the hammer incident.

22

On appeal, the People agree that section 654 requires a stay of the sentence for battery with infliction of serious bodily injury (count 2) "[b]ecause the assault and battery were based on the same blow to [D.M.]."

a. *Section 654*

Under section 654, subdivision (a), "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." " 'It is well settled that section 654 protects against multiple punishment, not multiple conviction. [Citation.]' [Citation.]" (*People v. Correa* (2012) 54 Cal.4th 331, 336, fn. omitted.) "[T]he accepted 'procedure is to sentence defendant for each count and stay execution of sentence on certain of the convictions to which section 654 is applicable.' [Citations.]" (*People v. Jones* (2012) 54 Cal.4th 350, 353.) Thus, "[w]hen section 954 permits multiple conviction, but section 654 prohibits multiple punishment, the trial court must stay execution of sentence on the convictions for which multiple punishment is prohibited. [Citations.]" (*People v. Reed* (2006) 38 Cal.4th 1224, 1227.)

"Whether a defendant may be subjected to multiple punishment under section 654 requires a two-step inquiry, because the statutory reference to an 'act or omission' may include not only a discrete physical act but also a course of conduct encompassing several acts pursued with a single objective. [Citations.] We first consider if the different crimes were completed by a 'single physical act.' [Citation.] If so, the defendant may not be punished more than once for that act. Only if we conclude that the case involves more than a single act—i.e., a course of conduct—do we then consider whether that course of conduct reflects a single ' "intent and objective" ' or multiple intents and objectives. [Citations.]" (*People v. Corpening* (2016) 2 Cal.5th 307, 311-312.)

b. *Threshold Problem*: *No Sentence was Pronounced*

Both parties appear to believe that the trial court pronounced judgment in this case. But neither has, by specific citation to the record, directed us to any oral pronouncement of separate terms on each count of which defendant was found guilty or on any associated enhancement allegation that was found true by the jury, which terms add up to an aggregate eight-year sentence.

According to defendant, the court suspended execution of a total eight-year state prison sentence and placed him on probation for a term of three years. He acknowledges that the trial court did not state on the record how it calculated the aggregate eight-year sentence and refers us to the probation report's sentencing recommendations. Defendant accurately recounts that the trial court then ordered him to serve as a condition of probation, two years in county jail, consisting of one year on count 1 and a consecutive year on count 2. (See § 19.2 ["In no case shall any person sentenced to confinement in a county . . . jail . . . as a condition of probation upon conviction of either a felony or a misdemeanor . . . be committed for a period in excess of one year . . . ."]; *People v. Jeffrey* (2004) 33 Cal.4th 312, 317 [recognizing that section 19.2 imposes a "one-year cap on the time that can be served in county jail as a condition of probation for any single violation"].)

The People claim that the trial court followed the probation officer's recommendations and imposed an eight-year aggregate prison sentence. They suggest that the total eight-year sentence consisted of (1) a three-year midterm for the conviction of assault with a deadly weapon (count 1); (2) a consecutive three-year enhancement term for personal infliction of great bodily injury as to count 1; (3) a consecutive one-year term for the conviction of battery with infliction of serious bodily injury (count 2); and (4) a consecutive one-year enhancement term for personal infliction of great bodily injury as to count 2. That may well have been what the trial court intended to do, but it did not actually pronounce those terms.

24

"In a criminal case, judgment is rendered when the trial court orally pronounces sentence. (§§ 1191 and 1202; *People v. Mesa* (1975) 14 Cal.3d 466, 471; *People v. Thomas* (1959) 52 Cal.2d 521, 529, fn. 3; 6 Witkin & Epstein, Cal. Criminal Law [(2d ed. 1989) Judgment and Attack in Trial Court], § 3101, p. 3825.)" (*People v. Karaman* (1992) 4 Cal.4th 335, 344, fn. 9.) It is a trial court's duty to pronounce judgment on each count of which a defendant is convicted. (*People v. Morrow* (1969) 275 Cal.App.2d 507, 516; see § 12 ["The several sections of this [Penal Code] which declare certain crimes to be punishable as therein mentioned, devolve a duty upon the court authorized to pass sentence, to determine and impose the punishment prescribed"].)

"The trial court is generally required to include all aspects of a judgment in its oral pronouncement of judgment. (See *People v. Mesa* (1975) 14 Cal.3d 466, 471.) Any discrepancy between the judgment as orally pronounced and as recorded in the clerk's minutes or abstract of judgment is presumed to be the result of clerical error. (*Ibid.*) The abstract of judgment [or minute order] 'does not control if different from the trial court's oral judgment and may not add to or modify the judgment it purports to digest or summarize.' (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.)" (*People v. Leon* (2020) 8 Cal.5th 831, 855.)

"When a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the choice of the appropriate term shall rest within the sound discretion of the court." (§ 1170, subd. (b).) The court must "set forth on the record the reasons for imposing the term selected." (*Ibid.*) In contrast, no term of imprisonment is specified if *imposition* of sentence is suspended. (*Ibid.*)

Section 1170.1, subdivision (a), states: "Except as otherwise provided by law, and subject to [s]ection 654, when any person is convicted of two or more felonies . . . and a consecutive term of imprisonment is imposed under [s]ections 669 and 1170, the aggregate term of imprisonment for all these convictions shall be the sum of the principal term, the subordinate term, and any additional term imposed for applicable enhancements

25

for prior convictions, prior prison terms, and [s]ection 12022.1. The principal term shall consist of the greatest term of imprisonment imposed by the court for any of the crimes, including any term imposed for applicable specific enhancements. The subordinate term for each consecutive offense shall consist of one-third of the middle term of imprisonment prescribed for each other felony conviction for which a consecutive term of imprisonment is imposed, and shall include one-third of the term imposed for any specific enhancements applicable to those subordinate offenses." (See § 1170.11.)

California Rules of Court, rule 4.433(c) states: "If a sentence of imprisonment is to be imposed, or if the execution of a sentence of imprisonment is to be suspended during a period of probation, the sentencing judge must: [¶] (1) Determine, under section 1170(b), whether to impose one of the three authorized terms of imprisonment referred to in section 1170(b), or any enhancement, and state on the record the reasons for imposing that term; [¶] (2) Determine whether any additional term of imprisonment provided for an enhancement charged and found will be stricken; [¶] (3) Determine whether the sentences will be consecutive or concurrent if the defendant has been convicted of multiple crimes; [¶] (4) Determine any issues raised by statutory prohibitions on the dual use of facts and statutory limitations on enhancements . . . ; and [¶] (5) Pronounce the court's judgment and sentence, stating the terms thereof and giving reasons for those matters for which reasons are required by law."

Here, the trial court did not orally pronounce the constituent terms of an aggregate eight-year sentence. Further, in granting probation, the court inconsistently indicated that it was suspending an eight-year state prison sentence and that it was suspending imposition of sentence. Even if we could retroactively reconstruct the intended sentence, it is the trial court that must orally pronounce it.

We will remand the matter to the trial court to clarify whether it had intended to orally pronounce sentence and suspend its execution and, if that was its intent, to do so.

If the trial court pronounces sentence upon remand, it may in the first instance resolve any section 654 claim that is raised.

C. *Allegation that Infliction of Great Bodily Injury is Element of Count 2 Offense*

In this case the jury impliedly found that D.M.'s forearm fracture was both a "serious bodily injury" within the meaning of section 243(d) (count 2) and a "great bodily injury" within the meaning of section 12022.7(a). Defendant argues that a statutory limitation—section 12022.7, subdivision (g) (12022.7(g))—precluded an enhancement under section 12022.7(a) and that therefore the section 12022.7(a) enhancement attached to count 2 must be stricken. Under section 12022.7(g), section 12022.7(a) does not "apply if infliction of great bodily injury is an element of the offense." The People concede error.

As the trial court did not orally impose that enhancement, there is nothing to strike, even if we assume for the sake of argument that defendant's contention is correct. If the trial court pronounces judgment upon remand, it should address whether a section 12022.7(a) enhancement may be applied to a conviction of battery with infliction of serious bodily injury (§ 243(d)). (See 12022.7(g).)

## DISPOSITION

The January 19, 2016 order is reversed. The matter is remanded to the trial court with directions to (1) clarify whether its intent was to pronounce sentence and suspend its execution or to suspend imposition of sentence and (2) orally pronounce sentence and suspend its execution, if that was the court's intent.

_____

ELIA, J.

WE CONCUR:


_____

GREENWOOD, P.J.



_____

PREMO, J.


*People v. Rush*
H045678